CULPEPPER, Judge.
This is a suit for damages for severe burns sustained by plaintiff as a result of a propane gas explosion. The defendant, Continental Oil Company, is the owner of the underground storage tank from which the gas escaped. The district judge awarded plaintiff a total of $150,975.04 in general and special damages. Defendant appealed. Plaintiff answered the appeal, seeking an increase in the award.
In a pretrial stipulation defendant conceded its negligence in allowing the gas to escape. The sole issues are (1) plaintiff’s contributory negligence and (2) the quantum of the award.
The general facts are that on the night in question plaintiff, who is living separate and apart from her husband, was with a married male companion. They were parked on a public road in a rural area near defendant’s underground tank, used for the storage of propane gas under pressure. Plaintiff’s companion had “passed out” due to over indulgence in intoxicating liquor. In an effort to arouse him, plaintiff turned the ignition switch on the automobile to start it. There was a terrific explosion of the propane gas which had seeped into and around the automobile. Both plaintiff and her companion were blown out of the car and engulfed in flames. Patricia ran from the burning area and succeeded in extinguishing the flames from her clothes. She then returned to her companion and carried him a short distance away, where she finally succeeded in extinguishing the flames from his clothing. Then Patricia walked about a mile and called for help.
Her male companion died as a result of the burns he received. Plaintiff survived but sustained pain, disability and scarring which are the subject matters of this litigation.
CONTRIBUTORY NEGLIGENCE
Defendant’s plea of contributory negligence is based on the contention that due to plaintiff’s voluntary intoxication she failed to smell the propane gas and attempted to start the automobile, which she should have known would cause an explosion. Defendant quotes from 38 Am.Jur. 883, Negligence Section 203, the general rule that a person must use reasonable care for his own safety and, if as a result of voluntary drunkenness he has deprived himself of the capacity to do so and as a result thereof has suffered injury, he will be denied recovery on the grounds of contributory negligence. See also Manuel v. United *106 States Fire Insurance Company, La.App., 140 So.2d 702; Vaughn v. Cortez, La.App., 180 So.2d 796; Huckaby v. Bellow, La. App., 175 So.2d 914; and Lee v. Peerless Insurance Company, 248 La. 982, 183 So.2d 328.
The facts do not show that Patricia West was intoxicated to the degree that it substantially affected her ability to use reasonable care for her own safety. She had consumed five “screwdrivers” (vodka and orange juice) over a period of about four and one-half hours preceding the explosion. She testified she had a great capacity for this type of drink and that she was not intoxicated. Her actions immediately before and after the explosion do not support a conclusion that she was substantially under the influence of liquor. There is no medical evidence of intoxication. Of course, defendant bears the burden of proving contributory negligence. Parnell v. Connecticut Fire Insurance Company, 245 La. 16, 156 So.2d 462 (1963). The oil company has not sustained this burden.
Furthermore, even assuming that Patricia West was intoxicated, there is no proof that this was the cause of her failure to smell the gas. The evidence does not show that an ordinary reasonable person under the circumstances could or should have been able to see or smell the presence of propane gas.
The fact that plaintiff and her companion were parked on a public road where there was no reason to suspect the presence of escaped gas is another circumstance which weakens the plea of contributory negligence.
It is our conclusion that the trial judge correctly found plaintiff free of contributory negligence.
QUANTUM
The next issue is the quantum of the award. The accident occurred at about 11:00 p. m. on February 5, 1967. Plaintiff was taken to the Ville Platte Hospital at about 12:30 a. m. on February 6, 1967. She was seen initially by Dr. Barney J. Fusilier, who diagnosed burns over approximately 35% of the body surface. He gave first-aid treatment for pain, shock, infection, etc. and ordered her transferred to the Charity Hospital in Lake Charles, where she arrived at about 3:30 p. m. the same day.
In the Charity Hospital in Lake Charles she was treated by Dr. Joseph A. Lebat, whose initial record of admission is as follows :
“On admission Miss Belanger was presented as an obese female who was alert with burns of the body. She evidenced first and second degree burns of the face, both upper and lower extremities with involvement of both hands and the dorsum of both feet; the back was free of burns except for the shoulders. She had marked facial edema with periorbital swelling. The eyes could not be evaluated because of the edema.”
Patricia remained in the Charity Hospital in Lake Charles for about two and one-half months. Dr. Lebat finally estimated the burned area of the body at 39%, which he rounded out to 40’%. About half of this was first and second degree burns and the other half third degree burns.
At the time of plaintiff’s discharge from Charity Hospital in Lake Charles on April 19, 1967, Dr. Lebat made the following notation :
“Discharge Note:
“25 year old female admitted for partial thickness burns of face, neck, upper and lower extremities. Patient was treated— Furasin ointment to the face and Silver Nitrate soaks to the extremities. Patient had to undergo two debridement procedures and three grafting procedures. Grafting was very successful — better than 90% take each time. Patient was coaxed to effect motion of the joints of the elbow, wrist and fingers, however, *107 there was some difficulty — cooperation and future therapy was planned at physical therapy in New Orleans under the rehabilitation program. Patient’s chem-istries and hematological status was watched closely and remained in reasonably normal limits. Physical activity of the hands and elbows were coached actively and passively. At completion of grafting patient was discharged to New Orleans Charity for physical therapy and possible reconstructive surgery.
J. A. Lebat”
At Charity Hospital in New Orleans, plaintiff received physical therapy treatments in an effort to prevent disability from scarring. The principal areas of disability were the hands, writs and elbows. She was discharged from New Orleans Charity Hospital on May 5, 1967 but thereafter was readmitted on two occasions for corrective surgery performed by Dr. Paul W. Brand, a specialist in hand surgery. The right hand and wrist were done on July 27, 1967, and the left hand and wrist on September 29, 1967. Patricia was then released from New Orleans Charity Hospital on October 19, 1967 and had no further surgery at the time of trial on May 27, 1968.
The only residual disability is the loss of function of the arms and hands. In this regard, Dr. Brand, the hand specialist, testified as follows:
“As far as dexterity and power is concerned, I think that her right hand could be considered fifty percent. That’s to say she can grasp a knife and fork, a cup, a broom and she could get hold of most of the things that she needs to hold. It isn’t a dexterous hand. It doesn’t— the finger joints in — these joints are still very stiff. But I think that the gross movement, these movements, a pinch at the side of the thumb — not pinched forward but pinched to the side — and grasp, she can get her fingertips to within a centimeter of the palm of her hand on the right. So that I think from the dexterity point of view that would be classified as about fifty percent, or its reasonable to assume that it will become fifty percent. From the point of view of appearance, of course, it’s bad, and I would think that maybe it’s an eighty percent loss of its beauty as a hand. Now, the left hand is the same from sensation; it is not fifty percent in its function. It would be more like — more like— I mean it has lost about seventy percent, I would say, of its function. And it’s lost also approximately eighty percent of its appearance. And I’ve been thinking since I was asked to report to you gentlemen and what I would regard as the total disability of this pair of hands. I think it is certainly more than fifty percent. In other words, I think if somebody offered her a miracle and said, ‘We will give you an absolutely normal hand on your right side if you will totally sacrifice your left and throw it away in the bucket,’ I think she would do well to accept that. I think that the two hands together are of less value than one absolutely normal hand. I asked these kind of questions of myself in assessing these things, so that I think that perhaps it would be fair so say that she has something of the order of sixty-five percent disability so far as her hands are concerned.
“BY MR. TETE:
Q. Now, Doctor, this would not prevent her performing ordinary household chores, would it, sir ?
A. No. I would think that she would— if her household chores were of the rather basic type. I think she could handle cooking and sweeping and washing for her own household. I think that she would find difficulty perhaps in seeking employment. This would — this would be a disability. I think that an employer would need to be on the list of the rehabilitation center. And we — we have employers who are understanding people and who will bend over backwards to make opportunities. I don’t think she would find it difficult — she wouldn’t find *108 it easy to compete for employment even for straight housework.
Q. She could operate most household appliances though, could she not, sir, the vacuum cleaner and the washing machine ?
A. I think so in time. I think she probably could. She’d be slow. She’d be— she’d drop plates, you know, when she was washing — at the present time. But I think that if she were to — I think in the course of time — put it this way. I think that if she were a housewife and this was a secure situation I think that the problems would be relatively small. I think that she could handle them, but from the point of view of getting a job, I think perhaps she would find it difficult — in fact, I’m sure she would — to get a really gainful job unless it were more in the direction of her sense of responsibility, perhaps if she were in charge of a house and didn’t have to do much detailed work. I think that a pair of hands like that in seeking a job does put employers off.”
In other portions of his testimony, Dr. Brand expressed the opinion that with further physical therapy and surgery the functional disability to plaintiff’s hands could be reduced to about 50%.
Dr. J. William Cruikshank of Lake Charles, a specialist in industrial medicine with particular experience in the rehabilitation of burn cases, gave essentially the same diagnosis and prognosis as that of Dr. Brand with reference to the hands and arms.
Of course, in addition to the disability of her hands and arms, plaintiff has substantial residual scarring, some of which will be permanent. These scars can best be described by quoting from the testimony of Dr. Louis Krust, a specialist in plastic surgery, who examined plaintiff initially on July 20, 1967 and found the following:
“Her examination was limited to the face, arms'and legs, essentially the areas that were burned most severely. Examination of the face revealed heavy burn scars over the dorsum of the nose, at the left upper lip, the left central lip'— I mean, the central upper lip, over the mid-chin and both ears. The scarring over the upper lip was particularly heavy on the left, and the right ear seemed to be burned most severely, with loss of the helical rim and buckling of the ear. * * * Examination of the arms revealed both arms to be covered by heavy, leathery scars over the fingers, hands, wrists and forearms to above the level of the elbows bilaterally. At the initial examination the wrists were held in a volar position or flexed position by contrac-tures. The scar contractures also held the metacarpal phalangeal joints — which are the joints between the hand and the, the proximal joints between the hands and the fingers- — -in hyperextension, with the distal joints in flexion. Both thumbs were held close to the hand in abduction due to burn scar contractures. There were flexion contractures at the elbows due to scar across the antecubital fossa. This condition existed bilaterally. Examination of the legs revealed unsightly, heavy, leathery burn scars at the knees and above the knees anteriorly and upon measurement the scar was greater than eight by six inches on the right and greater than twelve by fourteen inches on the left. These were essentially the findings at the time of the initial examination.”
It was Dr. Krust’s opinion that much of the scarring could be corrected by excision of the scars and grafting new skin, taken from the back, to the affected areas. The doctor made these recommendations for future plastic surgery:
“Yes, I made several recommendations. The first was excision of burn scars over the wrists and dorsum of both hands and fingers, with release of interdigital contractures and of the abduction con-tractures of the thumbs. Resurfacing was to be accomplished by skin graft. Release of underlying joint contractures *109 at the time of excision of scars and grafting of the hands, that was number two. Number three, excision of scars of the forearms and elbows bilaterally, with extensive resurfacing with skin grafts. Number four, reconstruction of the right antihelix of the ear with a tube pedicle from the neck. Number five, excision and grafting of the scars of the nose, lip and chin.
Q. Were any recommendations made relative to the scarring on her legs?
A. At that time there were no recommendations made relative to the scarring of her legs, because there were no con-tractures involved. However, the legs can be improved cosmetically by skin grafting. I estimated that the above corrections could be accomplished in approximately twelve to fifteen operative procedures.”
On May 8, 1966 Dr. Krust saw plaintiff again and found the following, as shown by his testimony:
“On May 8th, 1968 my findings concerning the facial scars were essentially the same as those on initial examination. There have been no operative procedures for the correction of scarring over the nose, lip and right ear. I found on examination of the forearms and hands that the patient has had operative procedures to both hands by Doctors Brand and Day at Charity Hospital in New Orleans to release joint contractures and to resurface the dorsum of both hands with grafts. There has been an excellent result, with improvement in motion and surfacing of the hand to a great extent with soft, pliable skin. However, significant contractures, do persist, and inasmuch as Dr. Brand and Dr. Day performed the surgery I think perhaps the report should come from them concerning the hands. Examination of the forearms and elbows reveals the heavy, leathery scars to persist. The contrac-tures at the elbows are still present, and probably are somewhat permanent in a person this age, after having been held in a flexed position for a period of over a year. However, I feel that some improvement can be obtained by excision of the scars of the forearms and skin grafting. Examination of the legs reveals scars over the anterior knees and thighs as described in the initial report. The scars have softened somewhat, but are still thickened and could be improved with excision and grafting.”
Dr. Krust was also of the opinion the right ear could be improved by plastic surgery and, in any event, it could be covered by the hair. As to the facial scars, the chin had healed well and no further surgery was recommended. There was a heavy scar on the nose and one on the upper lip which Dr. Krust recommended be excised and replaced with skin grafted from the neck. This would- improve the appearance by removing the heavy scar, but would not result in complete cosmetic correction.
Dr. Krust estimates the future medical procedures would cost approximately $19,500. Of course, some of the corrective surgery was performed in New Orleans Charity Hospital after Dr. Krust’s first examination. We agree with the estimate by counsel for plaintiff that the procedures performed in Charity Hospital represent about $2,600 of the anticipated expense, leaving a balance of $16,900 in future medical expense.
Of course, the recommended plastic surgery will not completely remove all evidence of the scarring from the nose, lip, arms, hands, legs and ears but will substantially improve their appearance from a cosmetic standpoint.
The general facts about plaintiff’s background and earning ability show that she was 25 years of age at the time of the accident. She had graduated from Pine Prairie High School and continued to live with her parents on a small farm until she married Samuel Belanger in 1964. This marriage ended in separation in October of 1966. Thereafter plaintiff worked as *110 a barmaid in various clubs and lounges in the Ville Platte area, earning about $25 per week. Also, she at one time did housework in private homes earning approximately $25 per week, with room and board. Those mentioned are the only employments plaintiff ever had. She had no special training or experience and any loss of income due to the accident is minimal.
Our jurisprudence is now established that much discretion must be left to the trial judge or jury in the assessment of damages for tort, Gaspard v. LeMaire, on rehearing, 245 La. 239, 158 So.2d 149. Appellate review of the quantum of an award is limited to a consideration of whether the trial judge has abused his discretion, Ballard v. National Indemnity Company of Omaha, Nebraska, 246 La. 963, 169 So.2d 64 (1964). In the Ballard case the court also stated that the amounts of awards in previous “similar” cases are relevant only to determine whether there has been an abuse of discretion. But, it must be remembered that the adequacy or inadequacy of the award should be determined by the facts and circumstances peculiar to each case.
Plaintiff contends there are no similar cases from the appellate courts of Louisiana in which the injuries sustained were as serious as those in the present matter. Plaintiff cites only cases from other states.
Defendant cites several Louisiana cases in support of its contention that the trial judge in the present matter abused his discretion. In Jones v. Aetna Casualty & Surety Company, La.App., 198 So.2d 523 (2d Cir. 1967; writ of certiorari refused, 250 La. 930, 199 So.2d 926) the appellate court reduced to $40,000 a jury award of $71,833.43 in general damages to a 27 year old mother of two children. The injuries were as follows:
“These include in addition to pain and suffering, fractures of the right femur, the patella, the mandible, the condyle, the nasal septum, total loss of hearing in the right ear, multiple contusions, bruises and brain concussion. At the time of trial, November 15, 1966, Mrs. Jones still experienced residuals in the nature of pain from her leg, inability to stand for a sustained period of time, inability to fully bend her knee, and soreness and irritation resulting from the wires which were placed in her jaw bone. Her appearance presents a scarred forehead, face, neck and collar bone. The severance of nerves have left her with a total and permanent loss of hearing in one ear, and an absence of feeling in her lower lip and chin. This results in an inability to sense the presence of food or liquid on her lip or chin.”
In the same case, Jones v. Aetna Casualty & Surety Company, a $95,000 award to a 61 year old housewife was reduced to $50,000 where the injuries were described as follows:
“The greater portion of the award to Mrs. Adams was for injuries to her face and head. One of the attending surgeons, Dr. Albert L. Bicknell, testified the cosmetic results were the worst he had seen during his years of practice. She was thrown through the windshield head-first and the greater portion of her face was described as hanging away from the bone. There were crushing facial injuries to the face, mouth, lips, nose and septum and turbinates. After the accident she was in a critical condition from shock and loss of blood and underwent surgery which lasted two hours and forty-five minutes and necessitated approximately 400 sutures and ties. Nerve injuries involved muscle control and sensation. Some of the results include interference with eating and control of food inside of the mouth; she . is unable to control saliva running from the corner of her mouth; cannot register expression on the right side of her face; has to speak out of one side of her mouth, and half of her right cheek and the right side of her nose and lips are completely numbed.”
In Knotts v. Employers Casualty Company, La.App., 177 So.2d 630 (3rd Cir. 1965) *111 an award of $45,000 in general damages was affirmed. A special circumstance of the case was that Miss Knotts, 23 years of age, was a young lady of unusual beauty who had been elected in several beauty contests. In an automobile accident she was thrown through the front windshield. Nine front teeth were lost. Her face was badly scarred and it was conceded that plastic surgery would be of very questionable value. This is probably the highest award for facial scarring which has been affirmed in our appellate courts of Louisiana.
At this point it is appropriate to comment that in the present matter there are no special circumstances such as existed in the Knotts case. Although Patricia West was a young woman, 25 years of age, she could not have been described as beautiful. Furthermore, the facial scarring here was not nearly'as severe and can be largely corrected by plastic surgery.
Other cases cited by defendant are Lid-dell v. Public Service, Inc., La.App., 128 So.2d 80 (4th Cir. 1961) in which the trial court awarded $17,500 to a woman, approximately 50 years of age, who sustained scarring of the forehead, knee and arm; multiple rib fractures which healed in a deformed position; deep wounds in the buttocks and abdomen; and a concussion. The appellate court reduced the award to $10,000. Also, Billings v. Travelers Indemnity Company, La.App., 173 So.2d 354 (1st Cir. 1965) in which the district court awarded $20,000 to a 16 year old boy who suffered a deep penetrating wound extending into an eye socket, fracture of the malar bone, and contusion of tissues and muscles around the eye, resulting in severe disfigurement of the face. The appellate court upheld an award of about $16,000 in general damages.
In the present case the trial judge’s award was itemized as follows:
“1. Pain and suffering -$50,000.00
2. Past and future mental anguish and loss of enjoyment of life_ 25,000.00
3. Permanent disfigurement - 25,000.00
4. Permanent disability and loss of earnings - 40,000.00
5. Medical expenses, past and future- 10,975.04
TOTAL $150,975.04”
It is obvious that some of these items of damages are overlapping. For instance, the award for past and future mental anguish and loss of enjoyment of life is at least partially the result of any permanent disfigurement. We will not attempt to discuss each of the items of damages listed. Essentially, the task of the reviewing court is to determine whether the total sums of the awards for general damages constitutes an abuse of the trial court’s great discretion. 89 C.J.S. Trial § 508, p. 184.
In attempting to estimate the portion of the trial court’s award of $151,000 (in round figures) which represents special damages, we first notice that medical expense, past and future is $11,000 (in round figures) and loss of earnings is included in permanent disability. As explained above, any loss of earnings, past or future was not substantial. Hence, the award of $151,000 by the trial judge consisted of no more than $21,000 in special damages, which means that $130,000 represented general damages. In our opinion, this is greatly excessive and constitutes an abuse of the great discretion of the trial judge.
Considering all of the facts and circumstances peculiar to the present case and the awards which have been made in the cases discussed, we think an award for general *112 damages and loss of income in the present case in the sum of $70,000 is appropriate. As stated above, future medical expense is estimated at $16,900. Accordingly, we think the judgment appealed must be amended to reduce the total award to plaintiff to the sum of $86,900.
For the reasons assigned, the judgment appealed is amended so as to reduce the total award to plaintiff to the sum of $86,-900. Otherwise than as herein amended, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed, as amended.
FRUGE, J., dissents for reasons assigned by TATE, J., in his dissent.