414 So.2d 1298 (1982)
Marianne Minto HOLMAN, Plaintiff-Appellant,
v.
RELIANCE INSURANCE COMPANIES and Duer Burnett, Defendants-Appellees.
No. 14804.
Court of Appeal of Louisiana, Second Circuit.
April 5, 1982.
Rehearing Denied May 12, 1982.
*1300 Nelson, Hammons & Johnson by Brian D. Smith, Shreveport, for plaintiff-appellant.
Rountree & Hicks by Gordon E. Rountree, Shreveport, for defendants-appellees.
Before HALL, JASPER E. JONES and NORRIS, JJ.
NORRIS, Judge.
Plaintiff appeals from a judgment of the lower court rejecting her demands against the defendant boat operator and his insurer for damages resulting from injuries sustained while riding as a passenger in a ski boat on Cross Lake in Caddo Parish, Louisiana.

FACTS
The accident in question occurred late in the afternoon or early evening of June 3, 1979. Plaintiff, Marianne Minto Holman, and her brother, Dean Minto, went to the home of defendant, Duer Burnett. Together with Scott Creighbaum, these three decided to go water skiing on Cross Lake in defendant's boat, a relatively new 1978, 20 foot Sea Ray with a 350 cubic inch, 260 *1301 horsepower engine. Defendant Burnett was the only person to drive the boat during this skiing venture. The lake was described by all as "moderately choppy," its usual condition.
The first person to ski was plaintiff, a twenty-one year old female at the time of the accident and a good skier. She slalom skied for approximately 10-15 minutes without any unusual occurrences.
The next skier was Dean Minto. Defendant testified that there was nothing unusual occurring in connection with his skiing; however, plaintiff, Creighbaum and Minto testified that Burnett initially pulled Minto up faster than usual after which according to Minto, he just "dropped off." Thereafter, Minto was pulled up in an acceptable fashion. Minto's and Creighbaum's explanation of the initial pull was that they thought that Burnett may have been mad at Minto.
Minto estimated the boat speed during his skiing to be about 36-38 mph. Burnett estimated the speed to be 30-33 mph, admitted it could have been higher, but was certain it could not have exceeded 40 mph. Creighbaum's estimate of the speed was 33-35 mph, but he also was of the opinion that it could have been faster although not exceeding 40 mph. Plaintiff estimated the speed to be between 40-45 mph, contending that Burnett continued to pull Minto at that speed for some twenty minutes. However, none of the participants was specifically looking at the speedometer.
Prior to the accident, Minto had skied for 15-20 minutes. Burnett was seated in the driver's seat, Creighbaum was in the front passenger seat to the left of Burnett, and plaintiff was properly seated in the seat directly behind Creighbaum, a seat which was designed to face the rear of the boat, acting as a spotter for the skier.
Each participant in this skiing venture testified regarding the accident. Burnett was called to the stand first and testified that immediately preceding the accident he made a left turn. He did not believe he verbally indicated to Creighbaum or plaintiff that he was about to make a left turn to "put Minto on the whip" but stated it is his usual custom to hand signal the skier prior to such an occurrence. He assumed he did so on this occasion. He further testified that the left turn initially felt like a normal turn but halfway into the turn he experienced the feeling which occurs when the wheels on an automobile are abruptly and sharply turned because the rear of the boat swung to the right and tried to pass its front. Then the boat suddenly stopped as if it had hit something solid.[1] Burnett stated that the throttle at this point was still open at the speed at which he was pulling the skier. However, he further stated that when the boat stopped or after he felt like he had lost control of it he pulled the throttle back immediately. After this sudden stop, it felt like they were in rough water because the boat was rocking considerably from side to sidea situation he described as "turbulent." Prior to attempting the left turn he was glancing back and forth from the front to the rear of the boat observing both where he was going and the skier. He stated he observed no big waves, unusual boat wakes or objects in the water. Burnett acknowledged his awareness of this particular boat's tendency to oversteer to the left but persisted in his belief that the turn he began was a normal maneuver for putting a skier on the whip. He admitted the action of the boat in stopping after he got into the turn was extremely sudden, unexpected and definitely a surprise. Burnett was not thrown about in the boat but stated he felt the pressure of the jolt push him to the rear and right of the boat where he was protected by padding on the right side and the back of his seat to his rear. His only explanation for the occurrence was that it must have resulted from an interaction of the waves upon the boat at its particular angle at just the right time and under just the right circumstances. Subsequent to the accident, he tried to recreate the experience and was unable to do so.
*1302 Creighbaum was seventeen years old at the time of the accident and had skied with Burnett 25-30 times prior to June 3, 1979. He considered him to be an extremely safe driver. He felt as though he was sitting on his knees on the seat to the driver's left with his back against the console looking toward the rear of the boat at the skier. His description of the left turn was that it was about a 45 degree turn in the beginning but that it terminated very sharply. He also testified that the boat "sort of skipped over a wave," began to slide, jolted, and came to an abrupt stop. He did not think Burnett turned the boat initially any sharper than usual but admitted the accident happened pretty fast. He described the occurrence as abnormal and said that he had never felt a boat jolt like that. When the boat jolted, he attempted to grab for the seat and missed. The action of the boat threw him from the front to the rear of the boat, turning him around so that he landed on top of plaintiff. According to Creighbaum, Burnett gave no advance verbal warning that he was going to put the skier on the whip even though he usually signaled the skier.
Minto testified that he had skied with Burnett before and considered him to be a safe driver. He corroborated Creighbaum's testimony that he recalled no signal prior to the maneuver. However, he also admitted that a skier cannot be put on the whip without his consent because he can release the ski rope. He was toward the right side of the wake when he saw Burnett cut the boat to the left, plaintiff fall, and Creighbaum flip. He testified the turn was a sharp turn and initially described it as a 90 degree turn. However, his testimony about what constituted a 90 degree turn was somewhat confusing. He did testify that the boat stopped very abruptly terminating in a reverse direction with the front end facing opposite its original direction prior to the turn. He did admit that it was hard to judge in the water the sharpness of the turn and stated that when the turn occurred he could still see some of the back and all of the side of the boat.
Plaintiff testified that she was seated in the seat directly behind Creighbaum observing the skier. She believed the boat's speed to be between 40-45 mph when over the wind and water she heard defendant tell Creighbaum, "Let's put Dean on the whip." Immediately thereafter, the boat made a sharp, 90 degree turn; and she felt a sudden jolt and the boat stop. This jolt threw her from her seat; she hit the seat opposite her on her left ending upside down, under Creighbaum, with her hips on the seat she struck and her upper body on the floor in the corner of the boat with her neck and shoulders bent forward. Her testimony was further to the effect that had the statement which she overheard regarding the impending maneuver had time to register, and had she known it was going to occur immediately, she could have "held on" to something. She did admit under cross examination that the fact she had smoked a portion of three joints of marijuana with her brother and Burnett prior to their skiing could have had some effect on how quickly that statement registered with her.
After hearing all of the testimony and considering all of the evidence from this multiple day trial, the trial court in oral reasons rejected plaintiff's demands against defendant Burnett and his insurer finding that plaintiff had not proved defendant Burnett to be negligent in his operation of the boat and that plaintiff was negligent in riding in the boat after smoking marijuana and with a driver who had smoked marijuana. It is from this judgment that plaintiff appeals assigning the following errors to have been committed by the trial court:
A. The trial judge failed to find that defendant Duer Burnett was negligent in his operation of the boat.
B. The trial judge failed to apply the legal doctrine of res ipsa loquitur in this case.
C. The trial judge failed to follow the precedent of this Honorable Court set forth in Ratcliff v. United Services Automobile Association, 180 So.2d 58 (La.App. 2nd Cir. 1965), writ refused 248 La. 528, 180 So.2d 541 (1965).
D. The trial judge held, in dictum, that plaintiff was negligent and assumed the risk for her injuries.

*1303 E. The trial judge failed to apply the principle of strict liability to the facts presented.
We reverse for the reasons hereafter set forth finding that the doctrine of res ipsa loquitur is applicable; that defendant Burnett was negligent in his operation of the boat; that plaintiff was not contributorily negligent nor did she assume the risk of her injuries; and that plaintiff is entitled to damages.

CONSIDERATION OF ASSIGNMENTS OF ERROR "A", "B", AND "C"
Because of the nature of these assignments of error and their interrelation, we will consider them simultaneously.
The term "negligence" has been defined by the Louisiana Supreme Court in Callais v. Allstate Ins. Co., 334 So.2d 692 (La.1975), as follows:
Negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm. It is the breach of a duty, statutory or non-statutory, owed to another to protect that person from the particular harm that ensued. 334 So.2d 700.
La.R.S. 34:850.1 et seq. is entitled the "Uniform Pleasure Boating Act," and its declared purpose is to "further the public interest, welfare and safety by providing for the protection and promotion of safety in the operation of watercraft engaged in recreational boating." The pertinent applicable sections of this act are as follows:
La.R.S. 34:850.24 provides:
The owner of a watercraft shall be liable for any injury or damage occasioned by the negligent operation of such watercraft, whether such negligence consists of a violation of the provisions of the statutes of this state, or in the failure to observe such ordinary care in such operation as the rules of the common law require. The owner shall not be liable, however, unless such watercraft is being used with his or her express or implied consent. It shall be presumed that such watercraft is being operated with the knowledge and consent of the owner if, at the time of the injury or damage, it is under the control of his or her husband, wife, father, mother, brother, sister, son, daughter or other immediate member of the family.
La.R.S. 34:850.15(C) provides:
C. All motorboats having in tow or otherwise assisting a person on water skis, surf-board or similar contrivance, shall be operated in a careful and prudent manner and at a reasonable distance from persons and property so as not to endanger the life or property of any person.
La.R.S. 34:851.9(A) provides:
A. No person shall operate any motorboat or vessel, or manipulate any water skis, surfboard, or similar device in a reckless or negligent manner so as to endanger the life or propery of any persons.
Shreveport City Code Sec. 14-43 prohibits the negligent operation of boats or watercraft on Cross Lake, and Sec. 14-77 of the City Code provides:
A boat operator towing a skier on Cross Lake shall be responsible at all times for the safe operation of both the boat and the towed skier. The boat will be operated at all times in a safe and reasonable manner constantly mindful of the life and property of others. (Emphasis added).
Therefore, we conclude that the duty owed by defendant to plaintiff under the above referred to statutes and ordinances is to operate his boat in a careful, safe, prudent, reasonable and non-negligent manner so as not to endanger her life or property.
It is undisputed that the accident occurred when defendant Burnett was in the process of making at least a rather sharp left turn without decreasing his speed[2] in *1304 order to "put the skier on the whip;" however, the actual degree of the turn and the speed of the boat is not known. At some point into the turn, the boat jolted violently and abruptly stopped resulting in plaintiff's being thrown from her seat to the opposite side and rear of the boat and Creighbaum being catapulted from the left front seat to the right rear of the boat on top of plaintiff. Although defendant and Creighbaum were of the opinion that the turn began as a normal maneuver for this skiing purpose, they were unable to satisfactorily explain the cause of the unexpected severe jolt, abrupt halt and the movement of the boat which felt as though the rear of the boat was skidding to the right attempting to pass its front. Plaintiff and Minto were both of the opinion that the initial left turn was a sharper or more severe turn than were Burnett and Creighbaum. Notwithstanding this conflict in testimony regarding the degree of the turn or the speed of the boat, the evidence is clear that the resulting effect was that the boat attempted to "swap ends" coming to a most unusual, abrupt, jolting stop which caused Creighbaum and plaintiff to be dislodged from their seats and thrown to the rear of the boat.
In considering plaintiff's complaint regarding error of the trial court in failing to apply the doctrine of res ipsa loquitur and in failing to apply the ruling in Ratcliff, supra, we initially note the explanation of the doctrine of res ipsa loquitur as stated in the leading case of Boudreaux v. American Insurance Co., 262 La. 721, 264 So.2d 621 (1972), at page 636:
In this respect, the principle of "res ipsa loquitur" (the thing speaks for itself) sometimes comes into play as a rule of circumstantial evidence, whereby negligence is inferred on the part of a defendant because the facts indicate this to be the more probable cause of injury in the absence of other as-plausible explanation by witnesses found credible.6 Pilie v. National Food Stores of Louisiana, 245 La. 276, 158 So.2d 162 (1963); Larkin v. State Farm Mutual Auto. Ins. Co., 233 La. 544, 97 So.2d 389 (1957); Malone, Res Ipsa Loquitur and Proof by Inference, 4 La.L. Rev. 70 (1941); Comment, 25 La.L.Rev. 748 (1965). Thus, by this principle where properly applied, the circumstantial evidence indicates that the injury was caused by some negligence on the part of the defendant, without necessarily proving just what negligent act caused the injury.
We noted in Larkin v. State Farm Mutual Automobile Ins. Co., 233 La. 544, 97 So.2d 389, 391 (1957): "* * * the maxim [res ipsa loquitur] means only that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference... The application of the rule does not, therefore, dispense with the necessity that the plaintiff prove negligence, but is simply a step in the process of such proof, permitting the plaintiff, in a proper case, to place in the scales, along with proof of the accident and enough of the attending circumstances to invoke the rule, an inference of negligence ... When all the evidence is in, the question is still whether the preponderance is with the plaintiff."

Nevertheless, when all the evidence is in and the question is whether, by reason of the res ipsa loquitur rule, the plaintiff has preponderantly proved that the defendant is responsible in tort for his injury, we have in our most recent decision on the issue noted that the real test of applying res ipsa loquitur to be as follows: "Do the facts of the controversy suggest negligence of the defendant, rather than some other factors, as the most plausible explanation of the accident?" Pilie v. National Food Store, 245 La. 276, 158 So.2d 162, 165 (1963). (Italics ours.) On the other hand, application of the principle is defeated if "an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as one that it was due to his negligence." 158 So.2d 165 (Italics ours.) See also Comment, 25 La.L.Rev. 748, 764 (1965). This is simply another formulation of the burden of a plaintiff in a tort action to prove that, more probably than not, his injury was caused by the negligence of the defendant. (Emphasis added.)
*1305 In King v. King, 253 La. 270, 217 So.2d 395 (1968), cited in Footnote 6 of Boudreaux, supra, the Supreme Court declared that the applicability of this doctrine is to be determined at the conclusion of the trial.
It is apparent in Ratcliff v. United Automobile Assoc., supra, that this court invoked the doctrine of res ipsa loquitur, without so expressly stating, to an analogous factual situation where two young boys were pleasure boating, an accident resulted and there existed a conflict in their testimony about how the accident occurred. In resolving this conflict, we stated:
We are also firm in the opinion that the testimony justifies the finding of negligence with reference to young Gore's operation of the boat. There is a conflict in the testimony of the two boys as to the exact manner of occurrence of the accident. Gary Ratcliff testified that young Gore first decelerated the speed of the boat on approaching the wake then accelerated to full speed at the moment the boat hit the wake of the other craft. To the contrary, Gore testified that he neither decelerated nor accelerated the speed of the boat as he approached and crossed the wake. If there was no other basis for a conclusion except this contradictory testimony, it could not be said that plaintiff had established this charge of negligence. However, it was the testimony of both boys that on a number of occasions during the afternoon they had crossed the wake of other boats without incident. Gore admitted in his testimony that as the boat hit the wake it gave an unusual lurch which he could not explain. We think the only explanation is justified on the basis of Gary Ratcliff's testimony which, therefore, must be accepted. Only the violation of the duty of ordinary care in the operation of the boat under the conditions described could have resulted in an impact of the degree of force and violence which occurred.

The liability of defendant's assured is established by statute under the provisions of the "Uniform Pleasure Boating Act" as set forth in L.R.S. 34:850.1, et seq. The title of the Act clearly declares its purpose as intended to provide for the protection and promotion of safety in the operation of motorcraft engaged in recreational boating... (Emphasis added.)
Louisiana courts have consistently held that to utilize the doctrine of res ipsa loquitur the plaintiff must show that (1) the accident is of a kind that does not ordinarily occur in the absence of negligence, (2) the injury was caused by an agency or instrumentality within the actual or constructive control of the defendant, and (3) evidence of the real cause of the accident is more readily accessible to the defendant. See 25 La.L.Rev. 748.
In Sabella v. Baton Rouge General Hospital, 408 So.2d 382 (La.App. 1st Cir. 1981), the plaintiff was placed on a stretcher with its wheels allegedly locked and positioned against the x-ray table. After the x-ray technicians moved behind the screen, one of the technicians observed plaintiff's arm shift toward the x-ray table and the opposite side of the stretcher flip up resulting in plaintiff's falling to the floor. Employees of the defendant hospital who examined and tested the stretcher after the fall found that the wheels were still locked. Testing also showed that a grown man in the same position as plaintiff could not get the stretcher to flip by pushing against the x-ray table. The attending technicians had never seen such an accident occur, and the one who saw the accident testified he could not explain how the accident happened. The defendant offered proof that the technicians had complied with the normal hospital policy while x-raying plaintiff and that the method used offered more support than other available methods. The appellate court applying the res ipsa loquitur doctrine reversed the judgment of the trial court stating:
The evidence as a whole shows that the defendant's negligence was the most likely cause of plaintiff's accident. The plaintiff was on the stretcher under the technicians' direction in a position directed by them. The flipping over does not occur when proper care is taken. We therefore reverse. 408 So.2d at 384.
*1306 Another case invoking the application of this doctrine is Hawayek v. Simmons, 91 So.2d 49 (La.App.Orl.1956). Plaintiff and defendant were fishing from an open boat in Lake Ponchartrain. Defendant testified that he was making an overhand cast using a five foot rod with a casting reel. Plaintiff was seated in the forward part of the boat looking into the water and did not see defendant make his cast. However, he felt a stinging sensation in his eye and from it extracted the hook on the fishing line of defendant. The trial court rejected the plaintiff's demands in his suit concluding it was just as reasonable to assume plaintiff was in error when he stated he did not move as it was to assume defendant was in error when he testified he cast overhand rather than sidearmed. The appellate court reversed reasoning:
We believe under these circumstances that the doctrine of res ipsa loquitur is clearly admissible in the case. The leading authority in this state enunciating the doctrine is Lykiardopoulo v. New Orleans & C. R. Light & Power Co., 127 La. 309, 53 So. 575, 576, in which the Supreme Court said:
"* * * In cases where the plaintiff cannot be expected to have any information as to the causes of the accident, whereas the defendant, on the contrary, must be assumed to be fully informed on the subject, and where the accident is of the kind which ordinarily do not occur when due care has been exercised, the rule of evidence is that the accident speaks for itself res ipsa loquiturthat is to say, that a presumption of negligence arises from the fact itself of the accident. In such cases, the plaintiff not only need not allege the particular acts of omission or commission from which the accident has resulted, but need not even prove them. The accident itself makes out a prima facie case, and the burden is on defendant to show absence of negligence. Res ipsa loquitur. * * *"
* * * * * *
In the case at bar the plaintiff's attention was directed to a fish alongside the boat when Simmons' lure struck him in the eye. As he was not looking at defendant, of course it was not possible for him to say exactly what defendant did that might have caused the accident, and we believe that under the circumstances of the case we must assume that Simmons was fully informed as to what caused the lure to damage plaintiff's eye, while the plaintiff, as we have said, clearly did not have any such information. It seems to us that when a fisherman makes an overhead-forward cast, his lure would not be expected to take a lateral and horizontal tangent and strike another person in the boat but for some fault or negligence on the part of the one who makes the cast. Under the established jurisprudence of the State and under such facts there necessarily arises the presumption that Simmons was negligent from the happening of the accident itselfres ipsa loquitur.
We do not believe that it can even be questioned that the defendants have not shown that Simmons was free from negligence in connection with the occurrence. To absolve themselves from liability, the burden was upon defendants to show that Simmons was guilty of no negligence and in the absence of such a showing, we can only presume that the accident occurred through some fault of Simmons who had sole charge of the instrumentality which caused the injury to plaintiff.
When the doctrine of res ipsa loquitur is applied in a damage suit, the defendant is charged with the duty of showing his freedom from negligence, i.e., that he did not do anything that he should not have done, that he left undone nothing he should have done and that he neglected no legal duty which he might have owed to the plaintiff ... (Emphasis added.)
We conclude that the trial court was clearly wrong in failing to apply the doctrine of res ipsa loquitur, and we hold that it is applicable to the instant case. Applying the aforementioned, well established rules of law, we conclude here, as we did in Ratcliff, supra, that only the violation of the duty of ordinary care in the operation of the boat by defendant in his negotiation of the left turn under these particular facts *1307 could have resulted in the abrupt, violent, jolting stop which caused this accident. The accident which occurred is of a kind that does not ordinarily occur in the absence of negligence. The injury was caused by defendant's boat which was in his actual control. Finally, evidence of the real cause of the accident is certainly more readily accessible to defendant as operator of the boat. The evidence as a whole shows defendant's negligence was the most plausible or likely cause of the abnormal behavior of the boat. He either negotiated the turn too sharply and/or at an unsafe speed under the circumstances and conditions that prevailed. His speculation, without proof, that the occurrence was just one of those things that happen when the right wave interactions strike a boat at just the right angle at just the right time is insufficient to rebut this inference of his negligence.

CONSIDERATION OF ASSIGNMENT OF ERROR "D"
In response to this assignment, defendants argue that plaintiff was contributorily negligent because she shared one marijuana cigarette with her brother enroute to Cross Lake at approximately 4:30 p. m. and two others with her brother and Burnett at his home during an approximate thirty minute period thereafter while waiting for Scott Creighbaum to arrive to ski. While admittedly plaintiff felt the effects of the marijuana,[3] there was no further consumption of marijuana after leaving the house nor during the 30-45 minutes which transpired prior to the accident. Plaintiff testified that over the wind and noise of the motor she heard Burnett state to Creighbaum, "Let's put Dean on the whip."[4] Her testimony was also that almost immediately thereafter the boat was negotiated into the turn resulting in the accident. When questioned by defense counsel regarding whether or not she had time to hold on to the side of the boat or to the seat, she answered that although she heard the comment it did not have time to register prior to the turn. She further admitted that the effects of the marijuana slowed her reaction time which could have been the reason that Burnett's statement about the maneuver did not register immediately.
The law is well settled that the defendant bears the burden of proving contributory negligence. West v. Continental Oil Co., 222 So.2d 104 (La.App. 3rd Cir. 1969), writ refused 254 La. 471, 223 So. 873 (1969).
Our review of the record in this case reveals that there is no medical testimony regarding the effects of marijuana on an individual, and the evidence further reveals that plaintiff slalom skied with no difficulty for a considerable period prior to the accident. None of the other witnesses testified that plaintiff was acting abnormally or evidencing any incapacity, high or intoxication. Prior to the accident, she was correctly seated in her seat "spotting the skier" and from 30-45 minutes had elapsed since leaving the house. In West, supra, the court stated on page 106:
The facts do not show that Patricia West was intoxicated to the degree that it substantially affected her ability to use reasonable care for her own safety. She had consumed five "screwdrivers" (vodka and orange juice) over a period of about four and one-half hours preceding the explosion. She testified she had a great capacity for this type of drink and that she was not intoxicated. Her actions immediately before and after the explosion do not support a conclusion that she was substantially under the influence of liquor. There is no medical evidence of intoxication.
We find that, likewise in the instant case, the facts are insufficient to show that plaintiff was under the influence of marijuana to a degree that it substantially affected her ability to use reasonable care for her *1308 safety. Her actions prior to the accident refute defendants' contention, as does the fact that Creighbaum, an experienced skier and boatsman who had not smoked marijuana or consumed anything intoxicating, was unable to prevent himself from being thrown from one end of the boat to the other. Furthermore, there is no evidence to show that plaintiff's actions in any respect were a cause in fact of the accident resulting in her injuries nor that her holding on to anything in the boat would have prevented or lessened these injuries.[5]
To bolster this conclusion, we consider the language in Ratcliff, supra, rejecting defendant's contention of contributory negligence as a bar to plaintiff's recovery in a situation where the plaintiff was not properly seated in the boat:
The plea of contributory negligence is largely based upon the argument that Gary Ratcliff was seated on top of the backrest of the front seat and was not properly supporting himself against the danger of being thrown from this position. The proof on this point is not sufficient to support the conclusion of contributory negligence, although young Ratcliff, subjected to a searching cross-examination, testified that he was not holding on. The correctness of this testimony is doubtful in view of his testimony under repeated cross-examination that he did not remember what he was doing with his hands. It is further to be noted in this connection that young Gore testified that Ratcliff was holding onto the seat with his left hand. In any event, Ratcliff was unaware of any danger which required him to support himself, since the uncontroverted testimony of both boys was to the effect that they had crossed the wakes of other boats without incident numerous times. It was the force of the impact with the wake and not the failure to support himself which caused the fall.
It is elemental that the plea of contributory negligence constitutes an affirmative defense which must be established by a preponderance of the evidence. Defendant has not discharged this burden in the instant case.
Additionally, in Gasquet v. Commercial Union Ins. Co., 391 So.2d 466 (La.App. 4th Cir. 1980), the contention that plaintiff was contributorily negligent for failing to hold on was rejected by the court stating:

Ratcliff, supra, supports our finding that Gasquet was not contributorily negligent even if it be conceded he was not holding on, absent proof that such "holding on" would have prevented the accident and/or the injuries suffered or would have lessened the injuries. The similarities between Ratcliff, supra, and the instant case in essential areas would, standing alone, dictate that we find plaintiff free of contributory negligence.
* * * * * *

Ratcliff, supra, found that the force of the impact of the boat with the wake and not the failure of the guest passenger to support himself caused the accident. Similarly the force of the impact of the airboat with the sandbar and not the failure of Gasquet, the guest passenger, to support himself caused the accident and injuries suffered by Gasquet.
We therefore hold that the evidence shows that the sudden, unexpected, abrupt, jolting stop of the boat engaging in the left turn, not the failure of the plaintiff to hold on, caused the accident and plaintiff's resulting injuries. There is no evidence that Burnett's statement to Creighbaum was even directed to plaintiff as a warning; and she was certainly not charged with the knowledge that his maneuver would occur immediately or result in such an abrupt, violent jolt causing two passengers to be thrown forcefully out of their seats. As we stated in Carroll v. Aetna Casualty and Surety Co., 301 So.2d 406 (La.App. 2nd Cir. 1974):
A guest in a boat, like a guest passenger in an automobile, is not obliged to look out for sudden or unexpected dangers. He has a right to place reliance *1309 upon the operator to discharge that obligation and is not required to monitor the operation or pay attention to the path ahead or the presence of obstructions or other boats. See Beavers v. Butler, 188 So.2d 725 (La.App. 2d Cir. 1966) writ refused 249 La. 739, 190 So.2d 242.
Interposed with the contention that plaintiff was contributorily negligent in riding with a boat operator whom she knew to be intoxicated or "high" is the contention raised in dicta by the trial court that plaintiff assumed the risk of her injury by riding with such a person. The record is devoid of any evidence which would show that Burnett was intoxicated or "high" on marijuana to a degree that contributed to his negligent operation of the boat. It is clear that to assume the risk of riding with a driver (here boat operator) who is intoxicated (high), the evidence must show (1) that the driver was intoxicated (high); and (2) his intoxication (high) was the cause of the accident; and (3) the plaintiff knew of the driver's intoxication (high). See Prestenbach v. Sentry Insurance Co., 340 So.2d 1331 (La.1976); Dorry v. Lafleur, 399 So.2d 559 (La.1981). In the instant case, defendant has not attempted to prove this aspect of assumption of the risk (for obvious reasons), and the record is insufficient to substantiate it.
However, defendants seriously contend that plaintiff as a participant in the water skiing trip assumed the ordinary and normal hazards incidental to that sport. They further contend that plaintiff's injuries were caused as a result of a normal and ordinary hazard incidental to and inherent in the sport of water skiing. We disagree.
It is an established rule of law that a participant in a sporting activity assumes the ordinary and normal hazards incidental to the sport in which he is participating, but it is an equally well established rule of law that a participant does not assume the risk of negligence on the part of a fellow participant. We have followed this rule in Carroll v. Aetna Casualty and Surety Co., supra, at pages 408-409, and our reasoning there is equally applicable to the instant case:
The contention that Carroll assumed the risk of injury by riding with Brown on the lake on a dark night without headlights at high speed is likewise not well-founded. A participant in a fishing trip or other sporting activity assumes the ordinary and normal hazards incidental to the sport, but does not assume the risk of negligence on the part of a fellow participant.

In Hawayek v. Simmons, 91 So.2d 49 (La.App.Orl.1956), where recovery was granted to a fisherman hooked in the cheek by his fishing partner while casting, the court held:
"No one will deny that a participant in almost any game or sport can be said, in legal contemplation, that by the fact of his participation therein he assumes all risks incidental to the particular game or sport which are obvious and foreseeable.
* * * * * *
"However, we do not believe that it may be said that plaintiff assumed the risk of such an accident as he sustained, the happening of which, under the doctrine of res ipsa loquitur, makes it legally certain that there was fault or negligence on the part of his companion on the fishing trip. Hawayek and Simmons were the only occupants of the boat and there is no valid reason why the plaintiff should have been expected to foresee that Simmons in casting out his line would throw it horizontally and sideways and into the boat so that the lure would cause injury to him. There is no merit in the defense that there was an assumption of the risk on plaintiff's part or that the asserted risk was incidental to the sport of fishing, obvious and necessary.
* * * * * *
"... While one who becomes part of a fishing venture might be said to assume all ordinary and normal hazards incident to the sport, the law does not require him to assume all risks of negligence of those other persons in the fishing party." (Emphasis added.)
See also Rosenberger v. Central Louisiana District Livestock Show, Inc., 312 So.2d 300 (La.1975).
*1310 Applying the foregoing to our finding that Burnett was negligent in his operation of the boat, we hold that plaintiff did not assume the risk of her injury caused thereby.

CONSIDERATION OF ASSIGNMENT OF ERROR "E"
Finally, plaintiff contends that the trial court should have applied the principle of strict liability to the instant case. Because we have found defendant Burnett's negligent operation of the boat to be the cause of the accident and the resulting damages to plaintiff, we pretermit any discussion of this assignment of error. However, we note there was no evidence whatsoever presented at trial for the purpose of proving that a defect existed in the boat.

DAMAGES
Having found defendant Burnett to be negligent thereby making him liable to plaintiff for any damages which she incurred as a result of this accident, we turn to the issue of damages.
Pursuant to La.Code of Civil Procedure Article 2164, Courts of Appeal are empowered to award damages in cases where the trial court initially rejects the plaintiff's demands and the record is complete with regard to damages. Sheppard v. Travelers Insurance Co., 333 So.2d 342 (La. App. 3rd Cir. 1976).
Plaintiff testified that immediately after the accident she experienced pain in her neck, back, left side and finger. She was unable to move from the floor of the boat and was removed from the boat to an ambulance by stretcher after which she was taken to Schumpert Hospital where she received emergency treatment, was x-rayed and was released after several hours.
The medical evidence in this case is lengthy and somewhat complicated. For the sake of brevity, we will not attempt to discuss in detail the testimony or reports of each doctor who treated plaintiff subsequent to this accident. However, we do note that she saw numerous members of the Shreveport medical community of varying disciplines, including a Chiropractor.[6]
We agree with the trial court's holding in dictum when it stated:
We believe this lady suffered some significant injury which was an aggravation of the previous automobile accident.
On March 31, 1979, plaintiff was involved in an automobile accident and sustained a cervical strain. Based on the medical evidence, we conclude that as a result of the boat accident which followed on June 3, 1979, she suffered a mild to moderate cervical and thoracic strain which aggravated the pre-existing neck injury resulting from the prior automobile accident.
The evidence is equally convincing that plaintiff's physical injuries were complicated by a pre-existing emotional disorder and her job as an assembly line worker at Western Electric.
Psychological experts testified that in her early childhood years plaintiff developed what was termed a "hysterical personality." At some point subsequent to the automobile and/or boat accidents for various, numerous reasons, her emotional condition deteriorated to the point where she unconsciously and unknowingly began converting her emotional stress into physical symptoms, including pain, which she focused on the injured *1311 part of her body, namely her neck. This emotional involvement, together with the aggravation of plaintiff's emotional and physical problems caused by many interrelated factors including her unhappiness with her job and its repetitious nature, extended and prolonged her normal recovery from the injuries sustained in the boating accident.
Dr. James Phillips, a psychiatrist with the Pain and Redevelopment Center in Shreveport treated plaintiff from August, 1980, until November 25, 1980. He testified that as a result of plaintiff's emotional involvement with her injuries, plaintiff developed what he described as "chronic pain syndrome," a condition where muscle spasms cause pain, pain results in emotional distress, emotional distress causes decreased tolerance to pain, decreased tolerance to pain results in stress induced muscle spasms. Thus, the cycle begins again. The pain which the plaintiff suffers as a result of this condition is real pain, and it was the consensus of the medical witnesses that plaintiff was not malingering.
Dr. Phillips unequivocally acknowledged that plaintiff's emotional condition was not caused by the boating accident, but he did feel that plaintiff's ability to cope with the condition may have been somewhat affected by this accident.
However, the evidence is equally clear that plaintiff's injuries from the accident were not the only stressful factor bearing upon her emotional condition. She was also unhappy with her job and was having marital problems, all of which contributed to her decreased ability to handle ordinary everyday stresses.
After reviewing carefully the lengthy testimony regarding plaintiff's various problems, we are convinced that the injuries resulting from the boating accident became interwoven with her preexisting emotional problem and were aggravated by the nature of her work. The resulting effect was that it took plaintiff longer than normal to recover from these injuries.
Recognizing that plaintiff's time of expected recovery was lengthened by her various problems, we are aware of the firmly established rule that a tortfeasor takes his victim as he finds him and is responsible for all of the natural and probable consequences of his tortious conduct. Perniciaro v. Brinch, 384 So.2d 392 (La.1980).
It is our finding that plaintiff suffered significant pain and mental anguish from the date of the accident until she ultimately terminated her employment with Western Electric on February 23, 1981. After this date, her symptoms began to subside. At the time of trial in late May of 1981, she testified that she had recovered from her injuries and was able to return to gainful employment. Although she stated that she had no desire to return to her assembly line position at Western Electric because it required her to keep her neck in a flexed position, was repetitive in nature, and involved the use of her hands and arms, she acknowledged that she was able to return to work.
We recognize that this case presents a novel situation insofar as the damage aspect is concerned. However, we note that each case involving personal injuries to a claimant is different. An award should be determined by the facts and circumstances peculiar to the case under consideration which will adequately compensate the injured party for his injury under the facts shown to exist in his case. Considering the particular effects of these particular injuries on this particular plaintiff, with her particular emotional and physical problems, we find an appropriate award on the basis of the evidence for general damages to be $12,500.

SPECIAL DAMAGES
Subsequent to this boat accident, plaintiff consulted numerous doctors in an effort to alleviate her symptoms resulting from the injury interwoven with her emotional problems and her dissatisfaction with her personal life and work. As we have stated heretofore, plaintiff should have recovered before she did. However, since we have found from the medical testimony that the injury, emotional problems, job, and personal problems are so closely interwoven, we will allow plaintiff recovery for the following medical expenses incurred:

*1312
Schumpert Medical Center $ 790.50
Willis-Knighton Medical Center 243.65
Mooring Chiropractic Clinic 330.50
The Orthopaedic Clinic 145.00
Orthopaedic Associates 157.00
Drs. Joffrion, Gleason, Jones &
 Waddell 203.00
Dr. Phillip Osborne 105.00
Boykin-Megison Neurological
 Surgery Clinic 135.00
Dr. James H. Phillips 370.00
Dr. M. B. Shah 400.00
The Boyd Clinic 60.00
Dr. Charles G. Itzig, Jr. 50.00
Drs. Carroll, Carlisle, Marshall,
 Williams & Peavy 238.00
Shreveport Pain and Rehabilitation
 Center, Inc. 1,212.50
Tri-State Physical Therapy, Inc. 137.00
Drugs and medication 39.05
 __________
TOTAL $4,616.20

Plaintiff further seeks an award for future medical expenses for future psychiatric expenses and for future non-psychiatric, medical expenses. We deny recovery for these expenses.
As previously discussed, plaintiff's "hysterical personality" pre-existed by many years the boating accident. Although plaintiff's injuries from the boating accident became closely interwoven with her long standing emotional problem, they clearly did not cause it. The evidence does not preponderate that the injuries from the accident precipitated the emotional problem or aggravated it beyond the date of the trial. Plaintiff's testimony at trial was to the effect that her present condition was equivalent to her condition prior to either accident. The only evidence which preponderates is that the emotional problem had the effect of lengthening the time of recovery from these injuries suffered as a result of the boating accident.
We recognize that where a defendant's negligence aggravates or activates a pre-existing injury or condition, he must compensate the victim for the full extent of the aggravation. Perniciaro v. Brinch, supra. However, we conclude here that any aggravation of plaintiff's pre-existing emotional problem did not extend beyond the date of trial. Therefore, defendants are not responsible for future psychiatric expenses to cure a condition which they did not cause, or one which the evidence fails to show by a preponderance that they activated or aggravated beyond the date of trial.
At the time of trial, plaintiff was tentatively under the care of Dr. Charles Itzig, Jr. He testified that when he last saw her on May 18, 1981, she complained less and was improved. This is corroborated by plaintiff's own testimony on May 28, 1981, that she had recovered from the effects of both accidents. Itzig did not indicate any specific future treatment for plaintiff nor did he refer to the cost of such future treatment. He indicated only that he would continue to treat her, that she was to contact him at some point after trial at which time they would discuss how she was doing, and that if she continued to improve he may not recommend psychiatric treatment.
Medical expenses in order to be recoverable must be proven. Awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable cost. Poche v. Frazier, 232 So.2d 851 (La.App. 4th Cir. 1970); Hincks v. Edge, 194 So.2d 400 (La. App. 4th Cir. 1967).
None of the physicians who testified at trial discussed future, non-psychiatric medical expenses. Since there is insufficient evidence presented herein to determine the actual cost of such alleged future, non-psychiatric medical expenses, damages cannot be awarded relative thereto because they are too speculative.
At the time of the accident, plaintiff was employed by Western Electric at a rate of pay evidenced by Exhibit "P-1." As a result of the accident, plaintiff initially missed two days of work. Thereafter, she missed ten days of work at the suggestion of Dr. Lee Etheredge and was on sick leave from June 23, 1980 to October 27, 1980. During this sick leave period, plaintiff showed significant improvement. After returning to work (under pressure from her husband), she began experiencing pain in her arms, shoulder, and neck. On February 23, 1981, she terminated her employment and remained unemployed through the trial.
*1313 Dr. James Phillips testified that in October, 1980, he considered plaintiff to be a marginal or borderline assembly line worker because of her emotional condition and was of the opinion that she really did not want to work at Western Electric. Dr. Phillip Osborn testified that as of September 18, 1980, he was of the opinion that further assembly line work would lessen plaintiff's chance of improvement.
Again, we note that because of the unusual factual situation we are faced with in this case and because the testimony is conclusive that plaintiff's injuries were closely interwoven with her emotional problems and aggravated by her assembly line work, we make the following award for past lost wages:

June, 1979 (two days at $4.88 per
 hour) $ 78.08
Spring, 1980 (ten days at $5.57 per
 hour) 445.60
June 23,1980  October 27,1980 6,264.37
February 23,1981  May 25,1981 3,208.40
 _________
TOTAL LOST WAGES $9,996.45

Finally, plaintiff contends that she is entitled to recover for impairment of her earning capacity or loss of future wages. We disagree.
As of May 28, 1981, plaintiff was of the opinion that her condition was back to pre automobile or boat accident. She stated she was able and willing to go to work. She did state that she did not intend to nor did she desire to return to assembly line work at Western Electric.
The law is well settled that a plaintiff must prove his loss with reasonable certainty to support an award for loss of future earnings. Speculation, conjecture and probabilities cannot form the basis for such an award. Chaney v. Our Lady of Fatima Catholic Church, 391 So.2d 501 (La. App. 3rd Cir. 1980); Watson v. Hartford Accident & Indemnity Co., 339 So.2d 480 (La.App. 2nd Cir. 1976) writ denied, 341 So.2d 1124 (La.1977); Burrows v. La. State Department of Highways, 319 So.2d 867 (La.App. 3rd Cir. 1975); Heard v. Sanders, 223 So.2d 212 (La.App. 2nd Cir. 1969).
We conclude that plaintiff has not proven with any certainty that her injuries from the boating accident, i.e., the mild to moderate cervical and thoracic strain, have incapacitated her from any future work of her choice. If, in fact, she has any future disability, we conclude that it will probably result from her long existing personality or emotional problem, not from the injuries she received in this accident. In this case, an award for loss of future earning capacity or of future earnings for a 23 year old female with a high school degree and two semesters of college (who expresses some desire to return to school), who is able and willing to work and has held various jobs in her work career, is much too speculative in nature. Therefore, we deny such an award.
Accordingly for the foregoing reasons, the judgment of the trial court is reversed and judgment is rendered in favor of plaintiff, Marianne Minto Holman, and against defendants, Reliance Insurance Co. and Duer Burnett, in solido, in the full amount of $27,112.65 with legal interest thereon from date of judicial demand and for all costs of this proceeding. Costs of this appeal are cast against defendants.
JUDGMENT REVERSED AND RENDERED.
NOTES
[1] After the accident defendant examined the hull and propeller of the boat and determined that the boat had not struck anything of a solid nature.
[2] As heretofore stated, the testimony of the witnesses is conflicting regarding the speed of the boat and the degree of the turn. The speed of the boat is estimated to be from 33 mph to 45 mph, and the degree of the turn is estimated to be from 45 degrees to 90 degrees.
[3] Plaintiff described that as a "feeling of lightheadedness" and a "floating feeling" which she termed a "marijuana high." She further testified that it takes "about an hour" for the effect of the marijuana to completely wear off.
[4] Neither Burnett nor Creighbaum could recall such a statement being made.
[5] There was no evidence presented by defendant which would show that there was anything in or on the boat which would have assured plaintiff's safety had she held on to it.
[6] We note that included among those consulted by plaintiff in connection with her injuries were:

Dr. Steve R. Mooring (Chiropractor)
Dr. Don K. Joffrion (Orthopedic Surgeon)
Dr. Austin W. Gleason (Orthopedic Surgeon)
Tri-State Physical Therapy
Dr. David D. Waddell (Orthopedic Surgeon)
Dr. Robert N. Schwendimann (Neurologist)
Dr. J. Lee Etheredge (Orthopedic Surgeon)
Dr. Harold R. Bicknell (Orthopedic Surgeon)
Dr. Frederick C. Boykin (Neurologist)
Dr. Loyd C. Megison, Jr. (Neurologist)
Dr. Phillip Osborne (Physician/Director of Pain & Rehabilitation Center)
Dr. James H. Phillips (Psychiatrist)
Dr. M. B. Shah (Physician/Physical Medicine & Rehabilitation)
Dr. Victor Hernandez (General, Thoracic, & Cardiovascular Surgeon)
Dr. Charles B. Itzig, Jr. (General Surgeon)
Dr. Thomas E. Staats (Psychologist)
Dr. Gaddis (Neurologist)