489 So.2d 335 (1986)
Mary GARRETT
v.
Joseph R. CELINO, Robert Weddell and Aetna Casualty & Surety Company.
No. CA-4965.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1986.
Rehearing Denied June 18, 1986.
*337 Johnston & Duplass, Robert M. Johnston, New Orleans, for defendants-appellants.
Clyde A. Ramirez, Ivan David Warner, III, Patricia D. Miskewicz, New Orleans, for plaintiff-appellee.
Before GARRISON, KLEES and WARD, JJ.
WARD, Judge.
Mary Garrett Ross filed suit to recover damages for injuries sustained when her feet were run over by a truck while she was crossing a street in New Orleans on August 29, 1983. She alleged that the driver of the truck, Robert Weddell, his employer who owned the truck, Joseph Celino, and the insurer of the truck, Aetna Casualty and Surety Company are liable for her injuries. After a bench trial the Court found Ms. Ross free of fault and Weddell negligent for failing to maintain a proper lookout while approaching an intersection. Judgment was entered in favor of Ms. Ross and against Weddell, Celino and Aetna, in solido, for $238,762.00, plus legal interest and all costs including an expert fee of $300.00.
The defendants bring this appeal, arguing that Weddell was not negligent and that the accident and resulting injuries were caused solely by Ms. Ross' negligence. In the alternative, should defendants be found liable, they argue that the damages awarded were excessive. Ms. Ross answered the appeal, contending she is free of fault, and if not, then under the rule of Baumgartner v. State Farm Mutual Automobile Insurance Co., 356 So.2d 400 (La.1978), which limited the defense of a contributory negligence in pedestrian-motorist suits, her recovery cannot be diminished because of any alleged contributory negligence.
The accident occurred on Elysian Fields Avenue, a major thoroughfare with a neutral ground dividing the northbound and southbound traffic, at Senate Street which feeds into the southbound side of Elysian Fields forming a "T" intersection. At this location, Elysian Fields is straight, level and has three traffic lanes but no traffic control signals or marked pedestrian crosswalk. Elysian Fields' "T" intersection with Senate is a distance of only two to three car lengths from Elysian Fields' intersection with Gentilly Boulevard where there are traffic signals. The time of the accident was 1 p.m. and the weather was clear and dry.
The pedestrians, the 45-year old victim Mary Ross, her son Alexis Ross and his friend Stephen Harris, both age 15, decided to cross Elysian Fields at its intersection with Senate Street. Because the traffic light at Gentilly Boulevard was red, there were automobiles stopped in the first two southbound lanes of Elysian Fields between Gentilly Boulevard and Senate, and backed up past Senate. The pedestrians walked side by side through the first two rows of stopped automobiles without incident.
The inside lane of Elysian Fields was clear of traffic in their pathway. As they were walking across the center lane, however, all three pedestrians saw Weddell's truck, an El Camino, less than one block away approaching Senate in the inside lane at about twenty-five m.p.h. All three pedestrians then looked away from the truck and toward the light on Gentilly Boulevard to see if it was still red. According to Alexis' testimony there were two automobiles stopped in the inside lane between Gentilly Boulevard and Senate. If this were so, Weddell would have stopped before the Senate-Elysian Fields intersection, leaving room for pedestrians to cross. Stephen, however, testified that he did not see any automobiles stopped in the inside lane between Gentilly Boulevard and Senate, and Ms. Ross testified that she could not remember whether there were cars in that lane. Because the light was still red, however, all three thought the truck, like the automobiles in the first two lanes, was going to stop at Senate. Looking back toward the approaching truck, Alexis and Stephen took one step into the third lane and realized that the truck was not going *338 to stop. Both jumped back into the center lane, avoiding the truck.
Ms. Ross, who was closest to the truck, did not look back toward the truck but continued to look at the red light and walked from the center lane into the inside lane directly into the path of the truck. She testified that she saw the boys jump back and then the next thing she remembered she was lying on her back in the street. When she attempted to get up, both of her feet were pinned under the right tire of Weddell's truck. Both Alexis and Stephen began knocking on the passenger-side window, screaming at Weddell to move the truck forward. When Weddell did not respond, Alexis went around to the driver's side of the truck and knocked on the window. When Alexis explained the situation to Weddell, he got out of the truck and went around the truck to see Ms. Ross. Weddell then returned to the truck and backed it off her feet. After the boys helped Ross to the neutral ground, the police were called and Ms. Ross was taken to Charity Hospital. She was later diagnosed as suffering from a herniated disc at the L4-5 level in the back.
As to the defendant's argument that Weddell was not negligent, we cannot say that, in view of these facts, the Trial Court was clearly wrong in finding Weddell negligent in failing to see and avoid hitting Ms. Ross. Drivers of motor vehicles have a never ceasing duty to keep a proper lookout ahead and to see what should be seen. Jackson v. Cook, 189 La. 860, 181 So. 195 (1938); Rottman v. Beverly, 183 La. 947, 165 So. 153 (1936).
As to Ms. Ross' alleged negligence, the question of whether to apply the doctrine of comparative negligence or the rule of Baumgartner in pedestrian-motorist cases was recently decided in Turner v. New Orleans Public Service, Inc., 476 So.2d 800 (La.1985), which was handed down after the trial of this case. In Turner our Supreme Court found that the legislative enactment of the comparative negligence statute La.C.C. art. 2323, effective August 1, 1980, obviated the need for the Baumgartner rule. The Supreme Court held that pedestrian-motorist cases are governed by the comparative fault doctrine of Article 2323. The issue of whether Ms. Ross may be found negligent having been resolved by Turner, we now consider whether she was in fact negligent.
Findings as to fault are factual and should be upheld on appeal unless clearly wrong. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985); Libertine v. Aetna Insurance Co., 477 So.2d 1286 (La.App. 3rd Cir.1985). The version of the facts presented above is essentially the testimony of the pedestrians and differs somewhat from Weddell's version. The Trial Judge chose to believe the pedestrians, and we cannot say his credibility determination was clearly wrong. Even believing the pedestrians' version of the accident, however, we find the Trial Judge was clearly wrong in finding Ms. Ross free of fault.
Pedestrians attempting to cross a street must keep a proper lookout for approaching traffic. Tinnin v. Donnelly, 311 So.2d 462 (La.App. 4th Cir.1975). Ms. Ross testified that while walking across the center lane she looked to her right and saw Weddell's truck less than a block away proceeding toward her at 25 m.p.h. in the inside lane. Continuing to walk, she then looked to her left and saw that the light on Gentilly Boulevard was red. Still looking to her left, away from the approaching truck, Ms. Ross walked directly into its path. By not looking at the approaching truck but nonetheless walking into its path, Ms. Ross breached her duty to keep a proper lookout for approaching traffic. Her negligence was a cause of the accident.
Having found that Ms. Ross' negligence contributed to the accident, and having affirmed the Trial Court's finding that Weddell was negligent, we must apportion fault between Ms. Ross and Weddell. In making this apportionment, we must consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct *339 and the damages. Watson, 469 So.2d at 974. To assess the nature of the conduct of the parties, we may consider:
... (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Id.
The conduct of Weddell was completely inattentive as shown by his failure to notice the red color of the traffic light, the stopped traffic or Ms. Ross. Although Ms. Ross was aware of the danger of the approaching truck, she nonetheless carelessly misjudged the speed of the truck, her position in the street or watched the light rather than the truck and then inadvertently walked into the path of the truck. Furthermore, Ms. Ross might have easily avoided the accident by stopping in the center lane and looking back at the truck before stepping into its path. The risk created by Weddell's conduct, however, was great and affected the public more than the risk created by Ms. Ross which endangered only herself. The extenuating factsthe red light at the Gentilly-Elysian Fields intersection and the traffic stopped for that light in the first two lanes of the Senate-Elysian Fields intersectionexplain why Ms. Ross proceeded, although improperly, into the path of the truck. No extenuating facts, however, excuse Weddell's conduct. Thus, we find that Weddell was more at fault than Ms. Ross in causing the accident and apportion the fault of Weddell at 80 percent and that of Ms. Ross as 20 percent.
The final issue defendants raise is the Trial Court's award of damages to Ms. Ross in the amount of $238,762.00. Of that amount, the $10,762.00 for medical expenses is not contested by the defendants. The remaining awards$63,000.00 for "loss of earning capacity and future loss of income" and $165,000.00 for "physical and mental pain and suffering, past and future"the defendants attack as excessive.
The defendants argue the $63,000.00 for future loss of income is excessive because it was based on projected loss of income from: 1) a reduced wage in Ms. Ross' primary job even though there was no evidence of a future reduction and 2) on four other jobs even though evidence of past employment showed that at the time of the accident Ms. Ross had only one other job, not four, in addition to her primary job. Ms. Ross, on the other hand, argues that the award was proper because damages for loss of earning capacity should be based upon her ability to earn money, rather than on what she actually was earning before the accident.
We recognize that Ms. Ross' earning capacity at the time of injury is not necessarily determinative of her future ability to earn income and that damages for impairment of earning capacity cannot be calculated with mathematical certainty. La.C.C. art. 1999; Folse v. Fakouri, 371 So.2d 1120 (La.1979) Nevertheless, the calculations of an actuarial expert merit substantial consideration by the trier of fact. Welton v. Falcon, 341 So.2d 564 (La.App. 4th Cir.1976). Moreover, other factors for consideration include the plaintiff's physical condition before the accident, her work record, the amount earned in previous years, and the probability that but for the injury she would earn similar wages for the remainder of her work life. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968).
The present record shows Ms. Ross was in good health and had no back problems. She had worked as a machine operator in a factory for 13 years, making $5.19 an hour before she moved to New Orleans in 1982. From January through July of 1983, Ms. *340 Ross worked as a sitter for an invalid woman for twelve hours a week at $4.00 an hour, a job which required lifting the woman to move her several times a day. From April 22, 1983 until July 21, 1984, Ms. Ross worked as a domestic maid earning $25.00 every two weeks. Ms. Ross quit this job a year after her accident because she was unable to perform required heavy physical labor.
From July 26, 1983 to the 1985 trial, Ms. Ross worked thirty to forty hours a week as a night-time supervisor at a half-way house for female convicts. Her duties involved no physical labor. At the date of trial, Ms. Ross had just received a raise in salary and was earning $4.25 an hour. Ms. Ross' supervisor, was pleased with Ms. Ross' work and had no plans to reduce her wage rate or to terminate her.
The record also contains calculations by defendants' expert witness in the field of labor economics, Dr. Melvill Wolfson. These calculations were made in response to hypothetical situations posed by Ms. Ross' counsel. Dr. Wolfson's figures were the present worth of Ms. Ross' future losses, which were derived by extending various wage rates per hour and per day to a yearly total using a 14-year worklife expectancy and a three percent yearly increase in wages at an 11.1 percent discount.
Specifically, Dr. Wolfson was asked to compute the income Ms. Ross would lose from her employment as a supervisor if her wage rate were reduced from $4.25 an hour to $4.00 an hour two years from the date of trial. Her lost income ranged from $5,416.00 to $12,070.00, depending on whether she worked a forty hour week or thirty-five hour week at a $4.00 an hour rate. Ms. Ross' lost income from the domestic job which she quit after the accident was $5,622.00. Assuming Ms. Ross had two additional similarly paid domestic jobs, Dr. Wolfson calculated that her loss income for these two jobs would be $11,244.00. Finally, Ms. Ross' lost income for her sitter job was $21,590.00. The total of this hypothetical lost income$5,416.00 or $12,070.00, $5,622.00, $11,244.00, and $21,590.00ranges from $43,872.00 to $50,526.00.
Finding Ms. Ross was severely limited in her opportunity for future employment because of her limited skills and education and because of her 10 percent permanent physical disability, the Trial Court awarded $63,000.00 for loss of future income. This award is significantly higher than $50,526.00, the higher total of the possible future lost income. Moreover, this $50,526.00 total includes future lost income of $12,070.00 from Ms. Ross' job as a supervisor based upon a reduced wage rate from $4.25 per hour to $4.00 per hour two years from the date of trial. The record, however, contains no evidence that Ms. Ross' wage will be reduced. Furthermore, there is no evidence of Ms. Ross ever working five jobs at one time. Accordingly, we now reduce that award.
The record shows that even though Ms. Ross's job as a sitter terminated because of the death of the invalid, she acquired experience as a sitter and presumably would seek such a job today but for her inability to perform heavy labor. Further, Ms. Ross would have a job as a domestic maid but for her physical disability. Her past work record demonstrates that she would have been able to work these two jobs in addition to her job as a supervisor. Hence, Ms. Ross is entitled to lost future income for her job as a sitter and her job as a domestic maid. Finding Dr. Wolfson's calculations of $21,590.00 and $5,622.00, respectively, as the present values of her lost future income to be proper, we conclude for this item of damages Ms. Ross is entitled to $26,212.00.
The defendants next argue that $165,000.00 for pain and suffering is excessive because in Jones v. Winston, 437 So.2d 889 (La.App. 2 Cir.1983), the ruptured disc victim received a substantially smaller amount. The defendants also argue that award to Ms. Ross is excessive because she was treated by a chymopapin injection procedure rather than by requiring an incision procedure.
*341 To assess the adequacy of an damages for pain and suffering an appellate court must look not to prior cases but to the facts of the case before the court. Our initial inquiry must be whether this trier of fact has abused his "much discretion" in the award to this particular plaintiff for the particular injuries and their effects upon her. La.C.C. art. 1999; Reck v. Stevens, 373 So.2d 498 (La.1979). Prior awards may serve as an aid in our initial inquiry only when the award before the court is shown to be greatly disproportionate to the mass of prior awards for truly similar injuries. Id. Thus, we can assess the adequacy of the present award not by comparing it to a selected past award raised by the defendants but by reviewing the facts of this case.
The Trial Judge found that Ms. Ross "had a ruptured disc at the L4-L5 level, for which she had surgery leaving her with a 10-15 percent loss of the body as a whole." Before the accident, Ms. Ross was in good health and had no back problems. The day of the accident and several days later, Ms. Ross went to the hospital for emergency room treatment. Dr. Ralph Gessner, an orthopedic surgeon, first saw Ms. Ross approximately a month after the accident when she complained of chronic headaches and persistent pain in her neck, back, and legs with limited motion of her legs due to pain. Dr. Gessner concluded that Ms. Ross had suffered contusions in both of her legs and lower back as well as a strain of the lower back, all of which he felt would heal with time. He prescribed conservative treatment.
Despite this treatment, in March of 1984 seven months after the accidentMs. Ross was still suffering from lower back pain. Dr. Gessner hospitalized Ms. Ross for a lumbar myelogram and discogram which revealed a herniated disc at the L4-5 level in the back. Because Ms. Ross had a great deal of anxiety, Dr. Gessner recommended dissolving the disc by chymopapain which is less traumatic than a lumbar laminectomy or fusion.
In July of 1984, approximately one year after the accident, Dr. Gessner performed the chymopapaina procedure which uses a pencil-thick, eight-inch long needle to inject chemonucleolysis, a foreign enzyme, directly into the spine. The procedure, Dr. Gessner testified, is a "significant" one and was performed with Ms. Ross under a general anthesia. Two of the risks associated with a chymopapain are the risk of an allergic reaction to the enzyme causing anaphylactic shocka complete collapse of the cardio-vascular systemand the risk of injury to the spinal cord causing paralysis. Ms. Ross was aware of these risks. She was hospitalized five days, two before the operation to receive medication to reduce the allergic reaction, should it occur, and three days afterwards for recovering.
Although the disc was dissolved, Dr. Gessner and Dr. Gordan Nutik, the defendant's specialist in orthopedics who examined Ms. Ross three times, both expected Ms. Ross to have a permanent disability of 10-15 percent of her body function. Dr. Gessner testified that Ms. Ross cannot participate in strenuous physical activities and that she can expect continued pain and discomfort for the rest of her life.
We find no abuse of the Trial Court's discretion in awarding Ms. Ross $165,000.00 for pain and suffering in view of the emotional anguish of the accident; the extensive treatment; the physical and mental pain endured during the year after the accident; the significant surgical procedure; and the permanent physical impairment.
In conclusion, Ms. Ross' damages consist of $10,762.00 for medical expenses, $26,212.00 for future loss of income, $165,000.00 for physical and mental pain and suffering, past and future, which is a total sum of $201,974.00. Reducing this sum by the amount attributable to Ms. Ross' 20 percent negligence$40,394.80, the judgment value of her claim is the sum of $161,579.20.
For the foregoing reasons the judgment of the Trial Court is amended as recast below:
*342 IT IS ORDERED that there be judgment in favor of plaintiff, Mary Ross, and against defendants, Robert Weddell, Joseph Celino and Aetna Casualty and Surety Company, in solido, in the sum of $161,579.20 with legal interest from judicial demand until paid.
IT IS FURTHER ORDERED that the expert witness fee of $300.00 for Dr. Ralph Gessner be taxed as costs.
IT IS FURTHER ORDERED that all costs in the Trial Court and on appeal be taxed against the defendants, Robert Weddell, Joseph Celino and Aetna Casualty and Surety Company.
AMENDED AND AFFIRMED.