539 So.2d 78 (1989)
James L. ARRUEBARRENA
v.
BOH BROTHERS CONSTRUCTION COMPANY, INC., et al.
No. 88-CA-0685.
Court of Appeal of Louisiana, Fourth Circuit.
February 16, 1989.
Rehearing Denied March 15, 1989.
*79 Kevin O'Bryon, Leake & Anderson, New Orleans, for appellant/defendant, Boh Bros. Const. Co., Inc.
Winthrop G. Gardner, New Orleans, for appellee/plaintiff, James L. Arruebarrena.
Before LOBRANO and ARMSTRONG, JJ., and PRESTON H. HUFFT, J. Pro Tem.
PRESTON H. HUFFT, Judge Pro Tem.
James L. Arruebarrena, plaintiff-appellee, brought suit against Boh Brothers Construction Company, Inc. (sometimes referred to hereinafter as "Boh Brothers"), defendant-appellant, for damages as a result of an accident that resulted when Mr. Arruebarrena's automobile skidded on oil that had leaked from a Boh Brother's truck onto a street. The trial court consolidated Mr. Arruebarrena's suit with that of his subrogated insurer, Aetna Casualty & Surety Company, for the recovery of medical payments and collision benefits. The applicable parties settled the latter action before trial. With respect to the former matter, the trial court on December 11, 1987, rendered judgment in favor of plaintiff and against defendant in the amount of Three Hundred Fifty-Eight Thousand One Hundred Nineteen and 50/100 Dollars ($358,119.50), which amount reflects general damages, lost past and future wages, and prior and future medical costs. The defendant has appealed timely from the trial court's judgment.

SPECIFICATIONS OF ERROR FOR REVIEW
Boh Brothers Construction Company, Inc., has assigned the following specifications of error for our review:
(1) The trial court committed manifest error and abused its much discretion by awarding Arruebarrena $250,000.00 in general damages for an unoperated disc, where Arruebarrena had had prior surgery at the identical level and had not missed one day of work since the accident.
(2) The trial court committed manifest error and abused its much discretion in awarding Arruebarrena $90,000.00 for past and future lost income, where Arruebarrena's income had increased since the accident.
(3) The trial court committed manifest error and abused its much discretion in awarding $3,119.50 for past medical expenses when it was stipulated that the amount of the medical expenses at issue were stipulated to be $971.50.
(4) The trial court committed manifest error in finding the negligence of Jules Lewis [driver of the Boh Brother's truck that had leaked oil] to be the sole cause of the accident, when the primary and proximate cause was the unexpected malfunction of the oil filter on Lewis' vehicle.

BACKGROUND FACTS
The Accident:
On Thursday, August 8, 1985, at approximately 2:15 p.m., Jules Lewis (sometimes referred to hereinafter as "Lewis") drove, in the course and scope of his employment with Boh Brothers, a truck owned by Boh Brothers, in the center lane of Claiborne *80 Avenue in the City of New Orleans. The truck began to leak oil as it approached the intersection of Claiborne Avenue with St. Andrew Street. Lewis brought the truck to a full stop approximately 100 feet before reaching the intersection. Lewis then drove the truck through a series of intersections while changing from the center to the right lane of Claiborne Avenue, turned right onto Martin Luther King Drive, and parked the truck next to a Church's Fried Chicken store. The truck leaked a large quantity of oil from its 13 gallon reservoir in a strip along the center and right lanes of Claiborne Avenue.
Meanwhile, Mr. Arruebarrena was returning to his office in Poydras Plaza (located at the intersection of Loyola Avenue and Poydras Street), and approached the site of the oil spill within a minute or two after Lewis had turned onto Martin Luther King Drive and had parked. Arruebarrena intended to bear to the extreme right lane of Claiborne that parallels the Claiborne Avenue Overpass (which begins just after the intersection with Martin Luther King Drive) so that he could turn right onto Earhardt Boulevard which crosses underneath the overpass and turns into Loyola Avenue and continues toward Poydras Street. While travelling at approximately 30 m.p.h. (35 m.p.h. maximum allowed) through the St. Andrew intersection, Arrubarrena noticed that the intersection lights changed from green to yellow and began to brake, in order to stop at the Martin Luther King intersection, while also attempting a change from the center to the right lane.
Prior to braking and effecting the lane change, plaintiff began to traverse the oil slick that he had not noticed. Immediately upon application of the brakes, the plaintiff felt his vehicle begin to slide to the right and rotate counterclockwise. In reaction, plaintiff then turned hard to the right and his vehicle immediately turned right and rotated clockwise. Plaintiff's vehicle then collided with a utility pole at the intersection of Claiborne Avenue and Martin Luther King Drive. The impact crushed inward the driver's side of the vehicle behind the door.
The collision threw plaintiff violently against the door on the driver's side of his vehicle. He immediately felt pain down the entire left side of his body and also suffered shock from fright and from the impact. Plaintiff also began to worry about what effect, if any, the accident might have on his back which had recently healed from major surgery by means of a laminectomy at disc L-4-L-5.
Plaintiff's Medical History Prior To The Accident:
Plaintiff had good reason to worry about the effect of the accident upon his back. Plaintiff did not have a back problem until April, 1983, when he injured his back while pulling a plant across his yard. The injury occasioned intermittant, severe lower back pain that radiated into plaintiff's left hip and leg. Plaintiff withstood this as best he could without pain medication or treatment except for periodic visits to a chiropractor. After sustaining this injury, plaintiff continued to play golf occasionally with Dr. John Olsen, a neurologist. Dr. Olson noticed a difference in plaintiff's gait and that plaintiff appeared to experience pain in his lower back. Plaintiff experienced a gradual worsening of his pain and so he went to see Dr. Olson in November, 1983, for diagnostic tests. Dr. Olson performed a physical examination and arranged for plaintiff to undergo a CAT scan.
The CAT scan showed a herniated disc at the L-5 level. Dr. Olson informed plaintiff that only surgery could eliminate the pain stemming from the herniated disc. At that time, plaintiff was very reluctant to have major back surgery, so he decided to wait to see if his symptoms would improve, even though he had been advised by Dr. Olson that they would not without surgery.
Plaintiff visited Dr. Olson again in July, 1984, because he continued to suffer from severe pain. Dr. Olson then performed an EMG test on plaintiff to determine if there were motor root involvement with his back *81 injury. The EMG performed on plaintiff showed a normal result indicating no motor root involvement associated with plaintiff's lower back pain.
Finally, in December, 1984, the pain plaintiff had suffered reached such a level that he asked Dr. Olson to refer him to a neurosurgeon for possible surgery. Dr. Olson then referred plaintiff to Dr. Donald Richardson who was and is head of the Department of Neurosurgery at Tulane University Medical Center. In January, 1985, Dr. Richardson performed a chymopapain procedure on plaintiff: a chemonucleosis enzyme was injected through a needle into the affected disc so that the enzyme would destroy the cartilage in the disc, the disc would shrink, the pressure would recede and relieve plaintiff's pain without surgery.
Approximately one week after this procedure, the plaintiff suffered extreme and unbearable pain. As a result, Dr. Richardson performed a laminectomy at the L-4 level in February, 1985, that relieved the pressure put on plaintiff's nerve by the herniated disc.
After this laminectomy, plaintiff experienced an immediate and sustantial subsidence of his leg pain which completely subsided over the following months. The pain plaintiff suffered in his lower back continued for a while as a result of the surgical incision for the laminectomy, but subsided almost completely during the recuperative period from February to June of 1985.
Plaintiff went back to work approximately two months after the operation which was sooner than the three months Dr. Richardson suggested.
In June, 1985, Dr. Richardson discharged plaintiff and considered the laminectomy to be highly successful. Dr. Richardson testified that plaintiff "recovered from his surgery quite well." Plaintiff was completely free of pain in his left leg and suffered slight pain in his lower back only on an infrequent basis when he "overdid" certain activities.
Dr. Richardson assigned to plaintiff a 15% permanent partial disability as a result of the laminectomy in February, 1985, and suggested to plaintiff that he limit repetitive bending and lifting.
From June, 1985, to August 8, 1985, the date of the automobile accident which is the subject of this litigation, plaintiff had resumed his normal activities at work and otherwise, except for the limitaions placed on him by Dr. Richardson. Plaintiff was leading a life essentially free of pain in his back, and completely free of pain in his hip and leg. He was also completely free of the mental pain and emotional distress associated with being in physical pain and from worrying about the condition of his back and leg.
Plaintiff's Medical History Following The Accident:
On the evening of the date of the accident, plaintiff started to experience a stiffness in his lower back; on the next morning, he awoke with a bruised hip and experienced pain that extended from his lower back and radiated down his hip and into his left leg. Plaintiff also worried that his painful back problems were starting all over again because of the accident.
On the day after the accident, plaintiff saw Dr. Lynn Posey, on referral from Dr. Olson who could not examine the plaintiff on that day. Dr. Posey recommended a conservative course of treatment in order to determine whether plaintiff's symptoms would resolve after approximately one month of prescribed chiropractic physical therapy. Dr. Posey recommended that plaintiff schedule a return visit at the end of one month's treatment.
Plaintiff saw Dr. Posey again in September and October of 1985. However, the symptoms had not decreased, but, rather, had persisted and gradually worsened. Plaintiff continued to have physical therapy during this period. Plaintiff also continued to worry about his back, specifically about the possibility of having to undergo further surgery with the attendant pain of recovery; he also worried about the effect his *82 back problem would have on his income and employment.
In October and December of 1985, plaintiff consulted with Dr. Olson and complained of lower back pain and left leg pain similar to the pain he had experienced prior to the laminectomy. In December, 1985, Dr. Olson performed an EMG and a CAT scan. Unlike the EMG performed prior to plaintiff's laminectomy, the latter EMG showed motor root involvement which causes a weakness in the affected limb and atrophy of the musculature of that limb. The CAT scan results showed a "perfusely bulging disc" at disc level L-4 and L-5. The physical examination and tests led Dr. Olson to diagnose plaintiff as having a herniated disc, nerve root compression and motor root involvement.
Plaintiff, extremely disheartened by this news, elected to continue with chiropractic physical therapy in a blind hope that his symptoms would somehow resolve without resort to further surgery that would be incredibly painful and less likely to be as successful as the first. Plaintiff also believed that he could not afford the loss of income attributable to the time period for surgery with a lengthy recovery and that he had no choice but to continue to work so long as he could tolerate the pain.
In August, 1986, plaintiff decided to consult again with Dr. Richardson concerning his back because his symptoms persisted and worsened. Dr. Richardson then suggested that plaintiff undergo an MRI test, which involves lying head first in a long tube for approximately one hour while the machine makes a constant pounding noise. Plaintiff took the test and testified that an MRI is "a surprisingly traumatic test to take" and "it's a very upsetting test."
In September, 1986, plaintiff returned to Dr. Richardson, who informed plaintiff that the MRI results showed a bulging disc at L4-L5 level in the central and left portions. From September, 1986, to the time of trial, plaintiff continued to live in chronic back pain that intensified or decreased according to plaintiff's level of activity.
Compounding plaintiff's injury is his condition of being a recovered alcoholic, as testified to by Dr. Chester Scrignar, plaintiff's psychiatrist, and Dr. Cornelius Gorman, plaintiff's vocationalist. Plaintiff has been abstinent for over six years. The disease of alcoholism prevents plaintiff from taking pain medication to relieve his daily back pain. Should he take such medication, he runs a high risk of becoming addicted to the pain medication or to taking up drinking once again.
Dr. Richardson testified at trial that, in his opinion, plaintiff must undergo surgery sometime within the next few years. He testified that there are no studies available which would indicate with precision when a patient, such as plaintiff, must undergo surgery given all the variables involved. However, he indicated that plaintiff's disc will never get better or stay the same. It will only degenerate. Based on this circumstance, Dr. Richardson testified that plaintiff can expect to be in varying amounts of pain, with the pain and physical incapacity gradually getting worse, until he has surgery.
Dr. Richardson testified, based on his experience with thousands of back operations, and based on his having previously operated on plaintiff's back, that the plaintiff faces a high probability of undergoing additional back surgery. Plaintiff testified that he will hold out until the pain becomes unbearable, as he did before his prior surgery, and then he will have a disc fusion as Dr. Richardson has recommended.
Dr. Richardson recommended that plaintiff undergo a fusion rather than simply another laminectomy. His recommendation rests upon four factors: (1) plaintiff is in his thirties and has a life expectancy of thirty to forty years, an extremely long period of time for a non-fused bad joint to hold up; (2) whereas an initial laminectomy has an 80% chance of success, a second laminectomy on the same disc has only a 60% chance of success; (3) plaintiff is well-motivated and would like to stay active and will not tolerate having persistent back *83 problems; (4) the L-4 disc, especially the mid-line type L-4 disc that plaintiff has, is notorious for producing long-term back pain even if the disc is reduced by way of laminectomy and the nerve root is decompressed to alleviate the leg pain. Dr. Richardson also stated that if he were the plaintiff, he would have a fusion rather than a laminectomy.
Dr. Richardson also testified that the time required for a surgical fusion is approximately three times that of a laminectomy and the recovery period from a fusion is approximately three times that of a laminectomy. While the recovery period for a laminectomy is normally three to four months, the recovery period for a fusion is nine to twelve months with an additional three to four months of physical therapy required before the patient can return to work.
The pain occasioned by a fusion is also much greater than that occasioned by a laminectomy. With a laminectomy, an incision is made in the back to expose the disc in need of repair. A fusion requires opening up the back as well as the hip and the scraping of the pelvis bones. These scrapings are grafted onto or inserted in between the vertebrae, in plaintiff's case, the L-4 and L-5. During the nine to twelve month recovery period for a fusion, the patient must wear a full body brace which runs from just below the armpits to the hips. The patient recovering from a laminectomy has no need to wear a brace.
Finally, instead of having a 15% permanent disability with a successful laminectomy, plaintiff would experience a 25% permanent disability from the fusion with a much higher disability rating should the fusion not "take" or be successful. Plaintiff's permanent restrictions with a 25% disability would be avoidance of bending, lifting, prolonged sitting, and prolonged standing.
Defendant sought to rebut Dr. Richardson's conclusion regarding plaintiff's need for a fusion through the testimony of Dr. John Schuhmacker. Dr. Schuhmaker admitted that plaintiff needs surgery if he is to relieve the pain in his back and leg, but concluded that he does not need a fusion but only a laminectomy. Dr. Schuhmacker's opinion was made after a one hour interview and without benefit of running a single test on plaintiff.
Both Dr. Richardson and Dr. Schuhmacker are in agreement that the automobile accident, the subject of this litigation, is the cause of plaintiff's current back condition.
The other medical testimony with regard to plaintiff's condition came from Dr. C.B. Scrignar, a psychiatrist and nationally recognized authority on the subject of post-traumatic stress syndrome. Dr. Scrignar testified that he examined plaintiff's mental status and discerned that plaintiff suffered from a number of anxieties attributable to the accident. In general, plaintiff has suffered mental or emotional distress from being in constant pain since the accident as well as emotional distress from worrying about his future need for medical treatment and the attendant pain. Plaintiff has severe worries about the financial impact of a lengthy recovery from further surgery. Plaintiff also has worried about his ability to keep his present position in the light of his increasing inability to work long hours and maintain the physical demands of being in the field. Dr. Scrignar also testified that plaintiff is suffering from post-traumatic stress syndrome.
Plaintiff's Employment History and Prospects:
Plaintiff is a branch manager for South Central Bell Advanced Systems (sometimes referred to hereinafter as "South Central Bell"). He supervises a sales force of ten who sell phone systems for offices. His work related activities may be apportioned approximately 30% to administrative work and approximately 70% to work in the field. John Clifford, plaintiff's supervisor, testified that plaintiff's field work involves supervising his sales personnel on sales appointments *84 and helping to "close" sales of telephone systems. In performing his field work, plaintiff makes approximately four to five calls a day, on average, which necessitates driving in his car.
South Central Bell hired plaintiff in September, 1985, approximately one month after the accident. In January, 1986, South Central Bell placed plaintiff on a "compensation" regime whereby his salary comprised a base salary of $33,000 and commissions based on meeting or exceeding a quota. Plaintiff has a high pressure job since he must make a quota based on sales volume set by his superiors with South Central Bell Advanced Systems.
In the calendar year 1986, plaintiff had an income of approximately $60,000 as reported on his IRS Form 1040. His income through September 30, 1987, was approximately $58,000. However, approximately $15,000 of this amount is attributable to commissions pertaining to sales made in December, 1986, and paid in January, 1987. Thus the income attributable to plaintiff's performance in 1986 is $75,000 and the income attributable to plaintiff's 1987 performance is $43,000.00. By properly attributing commissions to performance, one can see that diminished performance has had an effect upon plaintiff's earnings. For the first nine months of calender year 1986, plaintiff had reached 75% of quota but for the comparable period in 1987, he had reached only 50% of quota. A portion of the diminished performance appears attributable to plaintiff's pain and stress induced by the accident.
Plaintiff has worked since the accident in constant and increasing pain that has had a wearing effect on him both mentally and physically. Plaintiff has found increasing difficulty in both physically putting in the long hours necessary for a high level of performance and in maintaining the proper mental attitude necessary for a good job performance.
Plaintiff attributes his diminished performance in 1987 to the wearing effect of the physical pain and emotional distress he has endured as a result of the accident. His supervisor, John Clifford, testified that the general economic conditions regarding sales of phone systems in 1986 and 1987 are the same. Clifford also testified that plaintiff's sales team has added new sales people as substitutes in 1987, but that this condition should not, based on historical data, affect plaintiff's level of performance. In 1986, when plaintiff's sales team had new sales people added as substitutes, it did not affect plaintiff's level of performance. The addition of new sales people has not affected the performance of similarly situated South Central Bell Advanced Systems sales managers throughout their respective areas in Alabama, Mississippi and Louisiana.
Plaintiff predicted that he would not make 100% of quota in the remaining three months of 1987 because he had only achieved 50% of quota through the first nine months of 1987. Therefore, plaintiff estimated he would have a loss of income in 1987 as compared to 1986 of approximately $15,000 to $20,000, which loss he directly attributes to the accident.
With respect to plaintiff's employment prospects, a description of the policy of South Central Bell Advanced Systems regarding disabled employees appears appropriate.
An employee, such as plaintiff, who has two to five years of employment with South Central Bell, and who suffers a disability for less than twelve months, has his job held open for him and receives disability income, which in plaintiff's case would equal full income for 4 weeks and approximately 50% of his current net income for 48 weeks. An employee who suffers a disability for less than twelve months and returns to work but cannot perform the job he had prior to his disability, receives a job which he can perform. An employee who suffers a disability for more than twelve months, however, does not have his job held open for him; whether the company offers him a *85 new job is solely at the company's discretion.
The record reflects that plaintiff's job would be held open if plaintiff were disabled for less than twelve months. If plaintiff were unable to perform his job as sales manager upon returning, the company would make available a staff position which would not require the extensive field work required by such position. If plaintiff were to take such a staff position, the most plaintiff could expect to earn would be a salary of $47,000 a year, the amount paid for such a position. The holder of such a position cannot earn commissions.
If plaintiff were to suffer disability for more than twelve months, then he would lose his job as sales manager. Clifford was quite clear on this point when he said that he would have no choice but to replace plaintiff at that time. Whether the company employed plaintiff in another position would be solely at the company's discretion.
The record reflects that plaintiff eventually must undergo surgery for a fusion of the injured disc which entails a nine to twelve month recovery period and a three to four month rehabilitation period. More likely than not, plaintiff will eventually suffer a disability period in excess of twelve months. Plaintiff testified that the high pressure and the physical demands of his job in conjunction with the pain that he suffers would not allow him to continue at the necessary pace for more than six months to a year. Dr. Gorman confirmed this.
Dr. Gorman is a vocational diagnostic clinician who holds a bachelor's degree, two master's degrees and a doctorate. Dr. Gorman interviewed plaintiff extensively and administered comprehensive tests to determine plaintiff's intelligence, motivation, job skills and his ability to carry out the physical demands of his present occupation. Dr. Gorman concluded that plaintiff would not be able to continue in his current position because of the constant pain caused by the bulging disc and because of the associated physical and mental stress. Dr. Gorman recommended that plaintiff plan an orderly transition into a staff position over a six to twelve month period because of his physical and mental condition.
Dr. Gorman also concluded that fusion surgery would preclude plaintiff from meeting the physical demands of the field work required of his present position which requires daily driving and frequently getting in and out of a car, activities that comprise 70% of his working day, and the occasional lifting of sales presentation materials. In the event that plaintiff should completely lose his job or should be placed in the position of settling for an unsatisfactory and relatively low paying staff position, Dr. Gorman recommended, based on tests performed on and conversations with plaintiff, that plaintiff should consider being retrained as a lawyer by finishing undergraduate school and going to law school.
Thomas Meunier, defendant's expert, testified that plaintiff's injury has had no effect and will have no effect on his ability to maintain his current position. Meunier holds a bachelor's degree and is licensed as an occupational therapist; he saw plaintiff only one time, administered no tests, and based his conclusion on a definition of sales manager in the Dictionary of Occupational Titles. Meunier asserted that plaintiff could do his job as sales manager from a wheelchair because all that the position requires is talking and hearing.
With respect to plaintiff's loss of future earnings as a result of taking a staff position paying a salary of $47,000 a year, Dr. Seymour Goodman, plaintiff's expert economist, testified that the present value of the loss plaintiff would sustain by taking a staff position one year from the date of trial and after taxes would be $192,000.00. Defendant did not present its own economist to testify. Dr. Goodman also testified that the present value of plaintiff's loss of *86 income, should he return to school to become an attorney, would be approximately $500,000.00

OPINION
The first matter to address is whether the trial court committed manifest error and abused its "much discretion," as provided under La.C.C. Art. 1999, in awarding the plaintiff $250,000.00 in compensation for the general damages of pain and suffering. The standard of review consists of determining whether the trier of fact abused his "much discretion" in the award as to the particular plaintiff for his particular injuries and their effects. La.C.C. Art. 1999; Reck v. Stevens, 373 So.2d 498 (La. 1979). Accordingly, we must look to the facts of the instant case in order to make such a determination. Garrett v. Celino, 489 So.2d 335 (La.App. 4th Cir.1986).
Counsel for defendant has urged upon us that the trial court did abuse its "much discretion" in the award of damages to plaintiff and has provided quite an exhaustive list of awards for allegedly comparable injuries in support of defendant's position. Consideration of prior awards for comparable injuries, however, arises only after a review results in the necessary conclusion that the trier of fact committed manifest error and abused its "much discretion" so as to provide the appellate court with the information requisite for making an appropriate adjustment. Reck, supra. Such prior awards should not be taken into consideration for making the preliminary determination as to whether the trial court abused its "much discretion" in making its award for damages, except that truly similar injuries and their awards may be looked to in determining whether the trial court's award is unreasonably disproportionate to the mass of prior awards. Reck, supra; Garrett, supra.
The exhaustive rendition of the facts in this case that appears above outlines the basis for the trial court's decision. The plaintiff in the instant case has suffered the physical and emotional pain of an injury to his back at the very same location of a prior, painful and prolonged injury from which he had only just fully, and luckily, recovered. Plaintiff suffered through this prior injury without the benefit of the relief afforded by pain medication because he is a recovered alcoholic and is highly susceptible to chemical dependency. Now he must suffer the physical and mental torment of an even more serious injury at the same location. Furthermore, the plaintiff has endured his suffering stoically, courageously, while holding on to his job as long as and as best as he can with the certain knowledge that he must eventually undergo fusion surgery, a very painful operation, followed by a painful recovery period of nine to twelve months and a rehabilitation period of three to four months. Once plaintiff bows to the inevitability of surgery, he will not have the solace afforded by looking forward to returning to his job and picking up where he left off because his job will no longer be available to him. In addition, he will worry about the chances of having a successful surgery and recovery, which means at best a 25% disability and refraining from lifting and bending and from prolonged sitting or standing. These facts lead us to conclude necessarily that the trial court did not commit manifest error and did not abuse its much discretion in awarding plaintiff $250,000.00 for the general damages of pain and suffering.
The defendant has argued that the plaintiff could have mitigated his pain and suffering by electing to undergo fusion surgery as soon as possible rather than working until the pain becomes unbearable, particularly since he cannot take pain medication. The totality of the facts and circumstances of the case do not support defendant's position as a solution to plaintiff's problem. A long established principle of Louisiana law is that the tortfeasor takes his victim as he finds him. Reck v. Stevens, 373 So.2d 498, 502 (La.1979). Rececent jurisprudence suggests that the trier *87 of fact may consider a tort victim's sensitivity to pain because of a pre-existing condition in awarding damages. Toups v. T.G. & Y. Stores Co., 488 So.2d 296, 299 (La.App. 3rd Cir.1986). We cannot find manifest error and an abuse of discretion in the trial court's award of damages based upon plaintiff's particular circumstances of attempting to work as long as he can in pain and without benefit of pain medication rather than immediately undergo fusion surgery and thereby cut off whatever short time remains of his sales career.
The second matter to address is whether the trial court committed manifest error and abused its much discretion in awarding plaintiff $90,000.00 for past and future lost income. The defendant contends that plaintiff enjoyed an increase in income in the year of the accident and for each succeeding year and has therefore not suffered any diminution of income that may be attributable to the accident. However, the plaintiff presented evidence to the effect that a significant portion of his earnings for January, 1987, should be attributed to commissions earned in December, 1986. Thus the plaintiff did not have an increase in earnings for the year following the accident. In fact, he met only 50% of quota through September, 1987, whereas, in 1986, he had met 75% of quota for the same period. While the slumping local economy could partially explain such a reduced performance, some evidence presented indicates that other local sales teams, in Louisiana, Mississippi and Alabama, did not experience such a slump. Nor can the reduced performance be solely attributed to new sales personnel under plaintiff's direction because the record reflects that the presence of new sales personel does not necessarily result in reduced performance of a sales team manager.
Dr. Gorman, plaintiff's expert vocational therapist, recommended that plaintiff ease out of his high pressure, quota oriented job, and into a sedentary clerical position. Such a position would allow plaintiff to remain in the office and would relieve him of the mental pressure of making sales and the physical discomfort associated with repeatedly getting in and out of an automobile throughout the day, driving around and lifting equipment at sales calls on prospective customers.
Dr. Goodman, plaintiff's expert economist, testified that the present value of plaintiff's lost income from following such a course of action and from undergoing the eventual fusion surgery and rehabilitation would be approximately $192,000.00.
Dr. Gorman further indicated that plaintiff is the type of individual who might not find satisfaction in a clerical job once his back problem had been taken care of but who would find difficulty in acquiring a sales manager's job after being out of such a position for more than a year in an economy that is both highly competitive and which is expected to have limited possibilities. Dr. Gorman suggested that plaintiff might consider a career change by finishing his undergraduate studies and going to law school. Dr. Goodman testified that such a course of action would result in plaintiff's loss of income by approximately $500,000.00.
Although plaintiff would appear to face some difficulty in returning to employment similar to his present employment, the evidence presented does not wholly support the rather drastic measure that plaintiff change careers. However, the evidence does support the view that plaintiff, as a consequence of his injuries resulting from the accident, should ease out of his sales manager's position which will result in a diminution of earning capacity. The evidence also supports plaintiff's position that he must eventually undergo fusion surgery and rehabilitation for a period of more than one year. In view of the decrease in plaintiff's performance in his present job, the advisability that he ease out of his present job and into a more sedentary and less compensated one, the eventual certainty of being out of work while recovering from similar surgery and the difficulty in returning to work after recovery, we cannot *88 characterize the trial court's award of $90,000 for lost past and future wages as manifest error and an abuse of discretion.
The third matter to address is the propriety of the award for past medical expenses of $3,119.50. Counsel stipulated to the amount of $971.50 and contested an amount of approximately $300.00. The award of $3,119.50 should be reduced to $971.50. A stipulation constitutes an admission under La.C.C. Art. 1853; R.J. D'Hemecourt Petroleum v. McNamara, 444 So.2d 600 (La.1983), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984). The record before us does not support the award of the contested $300.00.
The fourth matter to address is the basis of liability imposed upon Boh Brothers Construction Co., Inc. The trial judge ruled that the evidence presented showed that Jules Lewis had caused the accident by negligently failing to put out warning flags and markers to call attention to the oil spilled on Claiborne Avenue. Counsel for the defendant urges us to rule that Boh Brothers should be found strictly liable for the injury resulting from the defect of a thing under its control and thereby enhance Boh Brothers' claim in a separate action against the manufacturer of the oil filter that allegedly caused the oil spill as a result of a malfunction. The record before us supports the trial judge's determination as a reasonable finding that Lewis' failure to warn resulted in the accident and injuries sustained by Mr. Arreubarrena. We cannot find manifest error and abuse of discretion in the trial judge's decision. However, this is not to say that such a position must neccessarily be adopted by another trial court with respect to the particular record placed before it. The fact finder there may well find otherwise. However, we cannot say that the trial court judge committed manifest error in deciding upon the basis of liability imposed after hearing the evidence presented.
Accordingly, for the foregoing reasons, we affirm the trial court's decision in imposing liability upon Boh Brothers Construction Co., Inc., and in awarding general damages of pain and suffering in the amount of $250,000.00 and lost past and future wages in the amount of $90,000.00. We also affirm the award of prior medical costs but modify the amount to $971.50 so as to conform with the stipulations of counsel.
AFFIRMED IN PART; MODIFIED IN PART.