541 So.2d 265 (1989)
Edward NAMAN, Jr.
v.
Bonnie SCHMIDT and State Farm Mutual Automobile Insurance Company.
No. 88-CA-1558.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1989.
*266 Lawrence D. Wiedemann, Fritz Wiedemann, New Orleans, for plaintiff-appellant.
James Ryan, III, Peter S. Title, Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler & Barkley, New Orleans, for defendant-appellee.
Before WARD, CIACCIO and PLOTKIN, JJ.
PLOTKIN, Judge.
Plaintiff Edward Naman Jr. appeals a trial court judgment awarding him $95,000 in general damages for back and shoulder injuries suffered in an automobile collision with defendant Bonnie Schmidt, claiming the amount is grossly inadequate in light of the prevailing law in this circuit, and challenging the trial court's refusal to award him damages for loss of earning capacity. We affirm.

FACTS
This litigation grew out of an automobile accident between plaintiff and defendant, who was driving a car owned by her roommate, Rosemary Schmidt. The accident occurred in the parking lot of the Village Square Shopping Center in Chalmette, La. on December 14, 1985. Naman was driving in a dominant lane of traffic when he struck Schmidt's vehicle, which was in a subservient lane. Although plaintiff initially stated that he was not hurt, he later developed pain in his back and shoulder, both of which required medical treatment. The back injury eventually required a microsurgical laminectomy.
The trial judge found that the defendant was 100 percent at fault in causing the accident. He awarded plaintiff $95,000 in general damages plus $15,427.06 in medical special damages, reduced by credits of $50,000 and $12,027.06 previously paid by defendants.
Quantum:
Plaintiff alleges that the $95,000 general damage award was grossly inadequate considering the extent of damages proven and the prevailing law in this circuit.
Naman testified at trial that although he felt no pain and suffered no apparent damage at the time of the impact, he was aching all over within three days of the accident, experiencing pain in his back and severe headaches, as well as a loss of feeling in his right leg. He stated that he finally sought treatment from a Dr. Thompson, who had previously treated him for some type of back problem about a year prior to the accident. Dr. Thompson treated him for his back problems by "stretching" his vertebra. Naman testified that he went to Thompson for therapy two to three times a week for an undisclosed amount of time. Dr. Thompson finally referred Naman to Dr. Kenneth Vogel in February of 1986.
Dr. Vogel, who was qualified as an expert in neurosurgery at the trial, testified that he first saw Naman on March 6, 1986. He stated that his opinion following his initial examination of the plaintiff was that he was in no acute distress. Dr. Vogel stated that his positive neurological findings were limited to Naman's low back region. Originally, Dr. Vogel treated the plaintiff with conservative care. During his second examination on April 24, 1986, he suggested a CAT scan, which was accomplished on May 15, 1986. The CAT scan revealed a left central bulging of the disc at L4-5, a small bulge at L5 and a suggested herniated disc at L3-4. He stated that he suspected the plaintiff's continued complaints were secondary to a herniated disc. Dr. Vogel testified that he told the plaintiff on May 15, and again during his next appointment on September 2, 1986, *267 that surgery was an option. He saw Naman on October 14, 1986, but noted no changes.
The plaintiff apparently tried to avoid surgery as long as possible, but phoned Dr. Vogel on November 13, 1986, saying the pain had become intractable and he was unable to tolerate the discomfort. He agreed to undergo surgery at that point.
Dr. Vogel performed a microsurgical laminectomy on December 1, 1986, almost a year after the accident. During the procedure, he discovered two abnormal discsa significant herniation at the L4-5 level and a moderate herniated disc with evidence of healing at the L3-4 level. The body's attempt to heal itself at the L3-4 level had resulted in a spurred nerve root, Dr. Vogel stated. He said the plaintiff tolerated the surgery well.
The plaintiff was next examined by Dr. Vogel six weeks after the surgery, when the doctor found that his symptoms were reduced to mild low back pain. The neurological exam revealed that the plaintiff's back had essentially returned to normal. The plaintiff was last seen by Dr. Vogel on February 26, 1987, when he was told he would reach a maximum medical improvement approximately one year after the surgery. Dr. Vogel noted on February 26 that the patient would probably have a ten to fifteen percent permanent partial total body anatomical disability. He advised him to avoid lifting, pushing or pulling anything greater than 50 pounds and to avoid repeated bending.
Regarding his shoulder injury, the plaintiff testified that he first noticed a problem with his right shoulder when he noticed a lump there at some undisclosed time after the automobile accident with the defendant. He never complained to anyone concerning a problem with his shoulder until February 18, 1986, more than two months after the accident. He stated that he had never had problems with his shoulder prior to that point and that he had never been treated by a doctor for problems with his shoulder. He eventually sought treatment for his shoulder from Dr. Wilmot Ploger.
Dr. Ploger was stipulated as an expert in orthopedic surgery at the trial and testified that he first saw Naman on February 28, 1986. He stated that he noted tenderness and swelling in the shoulder and found that the right shoulder was "riding a little higher" than the left. However, the plaintiff had a full range of motion in the shoulder and his circulation was normal. After viewing x-rays, Dr. Ploger determined that Naman had suffered a slight second degree separation of the right acromioclavicular joint, which sometimes occurs when the shoulder is struck either anteriorally, from the front or the side, or by a "jamming" of the shoulder ball and humerous against the socket. When a separation occurs, Dr. Ploger testified, the capsule surrounding the joint is torn and blood goes into the tissues, causing a painful inflammatory reaction. Dr. Ploger prescribed Naprosin, an anti-inflammatory drug.
Dr. Ploger testified that the medication resulted in the plaintiff getting progressively better. He last saw Naman on June 11, 1986, when he concluded that the pain had subsided except for occasional aches while the plaintiff was working. Dr. Ploger assigned a five percent partial anatomical disability of the shoulder, based on his belief that the plaintiff's joint has been damaged which often causes patients to experience pain, particularly with heavy work or overhead work. He stated that the change in the shoulder is permanent, although it could be corrected surgically. However, Dr. Ploger testified that Naman's separation was not severe enough to require surgery. Dr. Ploger felt that the plaintiff is at a greater risk of developing arthritis in the shoulder because of the injury. Naman testified at trial that he was still having problems with his shoulder, that it still ached, turned red and swelled if used.
Dr. Ploger stated that on the basis of the plaintiff's history, he would conclude that the shoulder injury was caused by the accident in question. However, the plaintiff's shoulder injury required only two visits to the doctor and was completely resolved through prescription medication.
*268 Under the mandate of the Louisiana Supreme Court's decision in Reck v. Stevens, 373 So.2d 498 (La.1979), the initial inquiry in determining whether a trial court award is either excessive or inadequate is whether the trier of fact abused its much discretion in setting the award. Id. at 501. Only after an articulated analysis of the facts discloses such an abuse of discretion may the award be amended. Id. In this initial determination, the value of prior awards have a limited functionthey may be considered only where the award is grossly disproportionate to awards for truly similar injuries. Id.
A close review of the Louisiana jurisprudence reveals three cases involving truly similar injuries to the back injury suffered by the plaintiff in the instant case. In Redondo v. Consolidated Freightways Corp., 529 So.2d 1296 (La.App. 4th Cir.), writ denied 533 So.2d 363 (La.1988), this court concluded that the lowest amount of general damages the trial court could have awarded to a plaintiff who suffered a herniated lumbar disc resulting in a microsurgical laminectomy following a period of conservative treatment was $100,000. In reaching that decision, the court relied on Riley v. Winn-Dixie Louisiana, Inc., 489 So.2d 931 (La.App. 5th Cir.1986), writs denied 494 So.2d 329 (La.1986), in which the fifth circuit concluded that a $100,000 general damage award is the low range for a herniated lumbar disc resulting in a laminectomy after conservative treatment. This court reaffirmed that position recently in its decision on rehearing in Jones v. Manny's Sanitary Supply Inc., 539 So.2d 198 (La.App. 4th Cir.1989).
Our review of the jurisprudence failed to reveal any cases dealing with injuries truly similar to the plaintiff's shoulder injury. However, as noted above, the trial judge would have been justified in considering that injury minimal in light of the fact that the plaintiff did not complain of the injury until more than two months after the accident, coupled with the fact that the injury was cured in a short period of time, through the use of prescription medicine, and only required two doctors visits.
As the above comparisons indicate, $95,000 is on the low end of the range of awards which would fall within the great discretion of the trier of fact for the injuries suffered by the plaintiff in this case. However, we are unable to say that the award was so low as to constitute an abuse of that discretion. Therefore, the general damage award is affirmed.
Loss of Earning Capacity:
The plaintiff alleges that the trial court erred in failing to award him damages for loss of earning capacity.
The record reveals that the plaintiff was unemployed at the time of the accident and that he had last worked for Brown & Root as a heavy equipment operator on September 5, 1985. He had been released from employment at that time because of a reduction in work force. Subsequent to the accident and prior to the time of trial, he had worked for Brown & Root for about a month, from sometime in June 1986 until July 25, 1986, when he was again terminated because the job was completed. He was then called to work at Brown & Root for about 10 days in August of 1987. He stated at trial that he was called by Brown & Root in October of 1987, but was unable to take that job because he had failed a physical. He said that he would not be eligible for future jobs with his former employer because he had been taken off the rolls. However, he failed to adequately explain why he had been allowed to work at Brown & Root in June and July of 1986 and again in October but would not be able to return at some later time if employment became available. Naman testified that he had also worked for at least two other companies between the accident and the trial, doing construction work and servicing vehicles.
Although Dr. Vogel testified that he advised Naman not to engage in employment requiring repeated stooping, bending, climbing or lifting, he admitted on cross examination that he was unable to say whether that would prevent the plaintiff from performing in his former occupation as a heavy equipment operator. He stated that the ten to fifteen percent disability *269 rating assigned to Naman's back was an anatomical disability, and that any functional disability experienced by the plaintiff would depend on the occupation. Saying that he was not a vocational counselor, Dr. Vogel admitted that he lacked the qualifications to determine the functional disability of the plaintiff in his job as a heavy equipment operator. Dr. Ploger stated that the five percent shoulder disability rating was also anatomical, not functional.
The general rule is that in order for a plaintiff to obtain an award for impaired earning capacity, or future loss of wages, he must present medical evidence which at least indicates that a residual disability causally related to the accident might exist. Bize v. Boyer, 408 So.2d 1309, 1311-12 (La.1982); Cockmeyer v. Langston, 487 So. 2d 525, 527 (La.App. 4th Cir.1986). However, the jurisprudence on the issue also requires that the plaintiff prove his loss with reasonable certainty. Holman v. Reliance Ins. Co., 414 So.2d 1298, 1313 (La. App. 2d Cir.), writ denied 420 So.2d 164 (La.1982). Although courts are not expected to calculate such awards with mathematical certainty, Garrett v. Celino, 489 So.2d 335, 339 (La.App. 4th Cir.1986), they cannot be based purely on speculation, conjecture and probabilities. Holman, 414 So. 2d at 1313. Therefore, in order to be entitled to an award for loss of earning capacity, the plaintiff must present sufficient evidence to allow the court to calculate the amount of the award with some measure of reasonable certainty.
In the instant case, any damage award for loss of future wages set by the trial court would have been purely speculative. Among a number of other things, calculations by actuarial experts are entitled to substantial consideration in setting awards for loss of future wages. Garrett, 489 So.2d at 339. In this case, the plaintiff not only failed to present the testimony of any economic expert of any kind, but he also failed to present the testimony of a vocational counselor to prove that his injuries adversely affected his ability to perform in his chosen profession. In light of his testimony that he was able to work for Brown & Root on at least two occasions after the accident, even before the back surgery, his testimony that he was later prohibited from returning because he had failed a physical is suspect. The facts of this case indicate that the plaintiff's failure to return to work could just as easily have been caused by the fact that no work was available. Therefore, we find that the trial judge was not manifestly erroneous in denying the plaintiff's request for damages for loss of earning capacity. The plaintiff failed to carry his burden of proving an actual loss of wages to a reasonable certainty.

CONCLUSION
For the above and foregoing reasons, the trial court's judgment awarding the plaintiff Edward Naman Jr. $95,000 and denying him any recovery for loss of earning capacity is affirmed.
AFFIRMED.